# EXHIBIT "A"



**Rikke Dierssen-Morice**
Direct Dial: 612.672.8389
Direct Fax: 612.642.8389
rikke.morice@maslon.com

February 16, 2021

*Via Personal Service*

Mendes & Mount, LLP
Agent for Service of Process for Lloyd's of London Syndicates 2623 and 623
750 7th Avenue, #24
New York, NY 10019

Re:     *Fair Isaac Corporation. v. Certain Underwriters at Lloyd's, London Subscribing to*
        *Beazley AFB Media Tech Policy Number W100FC171201, Syndicates 2623 and 623*
        **(Second Judicial District of Minnesota)**

To Mendes & Mount, LLP:

Our firm represents Fair Isaac Corporation ("FICO"), which is an insured under a "Beazley AFB
Media Tech" Insurance Policy, No. W100FC171201 ("the Policy), for which Certain
Underwriters at Lloyd's, London, Syndicates 2623 and 623, are subscribing underwriters ("the
Underwriters").

Item 10 of the Policy's Declarations provides: "Service of process in any suit shall be made
upon: Mendes & Mount, LLP, 750 7th Ave # 24, New York, NY 10019." The Policy further
states that Mendes & Mount, LLP "is authorized and directed to accept service of process on the
Underwriters' behalf in any such suit . . . ."

Pursuant to the Policy, including Section XXIII, enclosed and served on you herewith, as the
designated agent for service of process for the Underwriters, please find the following:

      1.     Summons to Syndicate 2623, Underwriter at Lloyd's, London Subscribing to
            Beazley AFB Media Tech Policy Number W100FC171201;

      2.     Summons to Syndicate 623, Underwriter at Lloyd's, London Subscribing to
            Beazley AFB Media Tech Policy Number W100FC171201; and

      3.     Complaint and Exhibit A.

Sincerely,

Rikke Dierssen-Morice
Enclosures

**STATE OF MINNESOTA**                                    **DISTRICT COURT**

**COUNTY OF RAMSEY**                          **SECOND JUDICIAL DISTRICT**
                                                         Case Type: Other Contracts
_____

Fair Isaac Corporation,                              Court File No.: _____

       Plaintiff,

     v.                                              **SUMMONS**

Certain Underwriters at Lloyd's, London
Subscribing to Beazley AFB Media Tech
Policy Number W100FC171201, Syndicates
2623 and 623,

       Defendants.

_____

THIS SUMMONS IS DIRECTED TO: Syndicate 2623, Underwriter at Lloyd's, London
Subscribing to Beazley AFB Media Tech Policy Number W100FC171201.

    1.    **YOU ARE BEING SUED**.  The Plaintiff has started a lawsuit against you.  The
Plaintiff's Complaint against you is attached to this Summons.  Do not throw these papers away.
They are official papers that affect your rights.  You must respond to this lawsuit even though it
may not yet be filed with the Court and there may be no court file number on this Summons.

    2.    **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS**.
You must give or mail to the person who signed this Summons **a written response** called an
Answer within 21 days of the date on which you received this Summons.  You must send a copy
of your Answer to the person who signed this Summons located at:

       Rikke Dierssen-Morice
       Maslon LLP
       3300 Wells Fargo Center
       90 South Seventh Street
       Minneapolis, MN 55402

    3.    **YOU MUST RESPOND TO EACH CLAIM**.  The Answer is your written
response to the Plaintiff's Complaint.  In your Answer you must state whether you agree or
disagree with each paragraph of the Complaint.  If you believe the Plaintiff should not be given
everything asked for in the Complaint, you must say so in your Answer.

    4.    **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN
RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS**.
If you do not Answer within 21 days, you will lose this case.  You will not get to tell your side of

the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5.     **LEGAL ASSISTANCE**. You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6.     **ALTERNATIVE DISPUTE RESOLUTION**. The parties may agree to or be ordered to participate in an Alternative Dispute Resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

**MASLON LLP**

Dated: February 15, 2021

By: _____

Rikke Dierssen-Morice (#0237826)
Bryan R. Freeman (#0387154)
Judah A. Druck (#0397764)
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140
Telephone: (612) 672-8200
Facsimile: (612) 672-8397
Email:    rikke.morice@maslon.com
          bryan.freeman@maslon.com
          judah.druck@maslon.com

**ATTORNEYS FOR FAIR ISAAC CORPORATION**

**STATE OF MINNESOTA**                          **DISTRICT COURT**

**COUNTY OF RAMSEY**                      **SECOND JUDICIAL DISTRICT**
                                                          Case Type: Other Contracts
_____

Fair Isaac Corporation,                          Court File No.: _____

              Plaintiff,

       v.                                                    **SUMMONS**

Certain Underwriters at Lloyd's, London
Subscribing to Beazley AFB Media Tech
Policy Number W100FC171201, Syndicates
2623 and 623,

              Defendants.
_____

THIS SUMMONS IS DIRECTED TO: Syndicate 623, Underwriter at Lloyd's, London
Subscribing to Beazley AFB Media Tech Policy Number W100FC171201.

       1.      **YOU ARE BEING SUED**.  The Plaintiff has started a lawsuit against you.  The
Plaintiff's Complaint against you is attached to this Summons.  Do not throw these papers away.
They are official papers that affect your rights.  You must respond to this lawsuit even though it
may not yet be filed with the Court and there may be no court file number on this Summons.

       2.      **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS**.
You must give or mail to the person who signed this Summons **a written response** called an
Answer within 21 days of the date on which you received this Summons.  You must send a copy
of your Answer to the person who signed this Summons located at:

              Rikke Dierssen-Morice
              Maslon LLP
              3300 Wells Fargo Center
              90 South Seventh Street
              Minneapolis, MN 55402

       3.      **YOU MUST RESPOND TO EACH CLAIM**.  The Answer is your written
response to the Plaintiff's Complaint.  In your Answer you must state whether you agree or
disagree with each paragraph of the Complaint.  If you believe the Plaintiff should not be given
everything asked for in the Complaint, you must say so in your Answer.

       4.      **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN
RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS**.
If you do not Answer within 21 days, you will lose this case.  You will not get to tell your side of

the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5.      **LEGAL ASSISTANCE**.  You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6.      **ALTERNATIVE DISPUTE RESOLUTION**.  The parties may agree to or be ordered to participate in an Alternative Dispute Resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

MASLON LLP

Dated:  February 15, 2021                           By: _____
                                                        Rikke Dierssen-Morice (#0237826)
                                                        Bryan R. Freeman (#0387154)
                                                        Judah A. Druck (#0397764)

                                                        3300 Wells Fargo Center
                                                        90 South Seventh Street
                                                        Minneapolis, MN  55402-4140
                                                        Telephone:  (612) 672-8200
                                                        Facsimile:  (612) 672-8397
                                                        Email:   rikke.morice@maslon.com
                                                                 bryan.freeman@maslon.com
                                                                 judah.druck@maslon.com

                                                        **ATTORNEYS FOR FAIR ISAAC CORPORATION**

**STATE OF MINNESOTA**

**COUNTY OF RAMSEY**

**DISTRICT COURT**

**SECOND JUDICIAL DISTRICT**
Case Type:  Other Contracts

---

| | |
|---|---|
| Fair Isaac Corporation,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>Certain Underwriters at Lloyd's, London Subscribing to Beazley AFB Media Tech Policy Number W100FC171201, Syndicates 2623 and 623,<br><br>　　　　Defendants. | Court File No. _____<br><br><br>**COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)** |

---

## COMPLAINT

For its Complaint against Certain Underwriters at Lloyd's, London Subscribing to Beazley AFB Media Tech Policy Number W100FC171201, Syndicates 2623 and 623 ("Beazley"), Fair Isaac Corporation ("FICO") states and alleges as follows:

## THE PARTIES

1.　　Plaintiff FICO developed the first-ever credit scoring model in 1958, with its credit scores used by potential creditors for loan origination, account management, and for prescreening purposes.

2.　　FICO has its principal place of business in San Jose, California and is a corporation organized under Delaware law.

3.　　Upon information and belief, Defendant Underwriters at Lloyd's, London subscribing to Beazley AFB Media Tech Policy Number W100FC171201, Syndicates 2623 and 623 ("the Underwriters" or "Beazley"), are insurance businesses with their principal place of business in London, England.

Filed in District Court
State of Minnesota
3/1/2021 2:12 PM

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the matters alleged herein.

5.      Under Section XXIII. of the "AFB MEDIA TECH" insurance policy at issue in this action, Beazley agrees to "submit to the jurisdiction of a court of competent jurisdiction within the United States."

6.      Jurisdiction and venue are proper in Ramsey County, Minnesota under Minnesota Statutes §§ 484.01, 542.01, 542.09 and 543.19, including because a substantial part of the events or omissions giving rise to FICO's claim occurred in Ramsey Count, including communications regarding the Claim between Beazley and FICO occurring to and from FICO's Roseville, Minnesota office, and communications between Beazley and FICO's insurance broker, Marsh & McLennan Agency LLC, occurring to and from Marsh's Minneapolis, Minnesota office.

7.      Upon information and belief, the Underwriters regularly transact and conduct their insurance business in this Judicial District, including by having issued the insurance policy at the heart of this insurance-coverage action to FICO in Minnesota, consistent with the insurance policy's listing of FICO's address in Roseville, Minnesota.

## BEAZLEY'S MEDIA TECH INSURANCE POLICY

8.      For the policy period of November 12, 2017 to November 12, 2018, Beazley sold liability insurance coverage to FICO under an "AFB MEDIA TECH" policy bearing policy number W100FC171201 (the "Media Tech Policy").

9.      A true and correct copy of the Media Tech Policy is attached as **Exhibit A**.

10.     FICO has paid all of the required premiums for the Media Tech Policy.

11.     The Media Tech Policy states on the Declarations page that it is a "**PROFESSIONAL AND TECHNOLOGY BASED SERVICES, TECHNOLOGY**

**PRODUCTS, INFORMATION SECURITY & PRIVACY, AND MULTIMEDIA AND ADVERTISING LIABILITY INSURANCE POLICY**."

12.     FICO is the "Named Insured" insured under the Media Tech Policy, listed with the address: "Rosedale Corporate Plaza, 2665 Long Lake Road, Building C, Roseville, MN 55113."

13.     The "Policy Aggregate Limit of Liability" under the Media Tech Policy is $15,000,000.

14.     The applicable retention is $2,000,000.

15.     Section I.F. of the Media Tech Policy is entitled "**Multimedia and Advertising Liability**."

16.     Under Coverage F, Beazley promises to pay on behalf of FICO:

> **Damages** and **Claims Expenses**, in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of liability imposed by law or **Assumed Under Contract** resulting from any **Claim** first made against any **Insured** during the **Policy Period** . . . for one or more of the following acts first committed on or after the **Retroactive Date** set forth in Item 6.A. of the Declarations and before the end of the **Policy Period** in the course of the Insured Organization's performance of **Professional Services**, **Media Activities** or **Technology Based Services**:
>
> 1.  defamation, libel, slander, product disparagement, trade libel, prima facie tort, infliction of emotional distress, outrage, outrageous conduct, or other tort related to disparagement or harm to the reputation or character of any person or organization.

***

17.     Section I.A. of the Media Tech Policy is entitled "**Professional and Technology Based Services Coverage**."

18.     Under Coverage A, Beazley promises to pay on behalf of FICO:

**Damages** and **Claim Expenses**, in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of any **Claim** first made against any **Insured** during the **Policy Period** . . . arising out of any (1) negligent act, error, omission, misstatement, misleading statement, breach of duty . . . in rendering or failure to render **Professional Services** . . . .

19.    Under the Media Tech Policy, the term "**Professional Services**" is defined to mean "the following services performed for others by or on behalf of the Insured Organization for a fee (or for free if provided in conjunction with other fee based services or products provided for compensation or to potential or existing customers as an encouragement to purchase such products or services)":

\*\*\*

1.  Scoring solutions: FICO scores, Qualify scores, marketing and bankruptcy scores, commercial credit risk scores, insurance scores, and ScoreNet and PreScore services

\*\*\*

20.    Under the Media Tech Policy, the term "**Media Activities**" means "**Media Communications** and/or the gathering, collection or recording of **Media Material** for inclusion in any **Media Communication** in the ordinary course of the **Insured Organization's** business."

21.    "**Media Communication**" is defined in the Media Tech Policy as "the display, broadcast, dissemination, distribution or release of **Media Material** to the public by the **Insured Organization**" and "**Media Material**" is defined to mean "words, sounds, numbers, images, or graphics or other information in electronic, print or broadcast form, including **Advertising** . . . ."

22.    Under the Media Tech Policy, the meaning of the term "**Claim**" includes "a written demand received by any **Insured** for money or services, including the service of a suit or institution of arbitration proceedings" and "a threat or initiation of a suit seeking injunctive relief (meaning a temporary restraining order or a preliminary or permanent injunction)."

4

23.     The definition of "**Claim**" in the Media Tech Policy further provides:

> Multiple **Claims** arising from the same or a series of related or
> repeated acts, errors or omissions, or from any continuing acts,
> errors or omissions . . . shall be considered a single **Claim** for the
> purposes of this Policy, irrespective of the number of claimants or
> Insureds involved in the **Claim**. All such **Claims** shall be deemed
> to have been made at the time of the first such **Claim**.

24.     Section II.A. of the Media Tech Policy, entitled "**DEFENSE AND
SETTLEMENT OF CLAIMS**," states:

> A.  The Underwriters shall have the right and duty to defend,
>     subject to all the provisions, terms and conditions of this
>     Policy:
>
>     1.  any **Claim** against the **Insured** seeking **Damages** which
>         are payable under the terms of this Policy, even if any of
>         the allegations of the **Claim** are groundless, false, or
>         fraudulent;
>
>     2.  any **Claim** in the form of a civil suit against the **Insured**
>         that seeks injunctive relief (meaning a temporary
>         restraining order or a preliminary or permanent injunction)
>         for one or more of the acts listed in Insuring Agreement F.
>         if:
>
>         (a)  the **Claim** is first made and reported to the
>              Underwriters during the **Policy Period** or **Optional
>              Extension Period** (if applicable); and
>
>         (b)  the act or acts were committed on or after the
>              **Retroactive Date** and before the end of the **Policy
>              Period** in the course of the **Insured's** performance of
>              **Professional Services**, **Media Activities** or
>              **Technology Based Services**.

\*\*\*

## THE TRANSUNION CLAIM AGAINST FICO

25.     On February 12, 2018, in the litigation captioned *Fair Isaac Corporation v. Trans
Union LLC*, Case No. 1:17-cv-08318 (N.D. Ill.) ("the TransUnion Litigation"), Trans Union LLC

62-CV-21-934

CASE 0:21-cv-00734-ECT-BRT   Doc. 1-1   Filed 03/18/21   Page 12 of 76   Filed in District Court
State of Minnesota
3/1/2021 2:12 PM

("TransUnion") made a claim against FICO in the form of its Counterclaim ("the TransUnion Claim").

26.     The TransUnion Claim involved allegations regarding a credit score product called VantageScore (hereinafter "VantageScore"), allegedly launched by an independent joint venture of TransUnion and two other credit reporting agencies.

27.     The TransUnion Claim requested money damages, an injunction, and other relief.

28.     The TransUnion Claim's allegations of FICO's wrongful acts included, but were not limited to, the following allegations:

- FICO "waged a disparaging public relations and advertising campaign to create fear, uncertainty, and doubt about VantageScore's viability and reliability with lenders and consumers." (TransUnion Claim ¶ 5.)

- "[FICO] has waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead lenders and consumers about the qualities and characteristics of FICO scores and VantageScore." (*Id.* ¶ 65.)

- "In advertisements, letters, and blog posts, [FICO] has disparaged VantageScore by calling it a 'Fako' score, falsely claimed that VantageScore is an unreliable measure of creditworthiness, and misrepresented the information considered by VantageScore's credit scoring system." (*Id.*)

- "[O]n December 12, 2017, [FICO] took out a full-page advertisement in the *Wall Street Journal* addressed to 'Lenders, Policymakers and Consumer Advocates' that disparaged VantageScore without identifying it by name." (*Id.* ¶ 66.)

- "The *Wall Street Journal* advertisement directed readers to 'Learn more at FICO.com/independent,' a [FICO]-owned website that connects visitors to articles and blog posts that disparage VantageScore by name." (*Id.* ¶ 67.)

- "Shortly after running the Wall Street Journal advertisement, [FICO] sent a letter to lenders and others stating that [FICO] was 'launching a campaign to counter' VantageScore's credit scores . . . . The letter makes the false and misleading claim that using VantageScore instead of FICO Classic scores for mortgage lending would not benefit consumers by taking into account their 'telco and utility payment data' because 'the longstanding FICO Score models integrated into Fannie Mae and Freddie Mac already incorporate this very data.'" (*Id.* ¶ 68.)

- "[FICO's] public website includes numerous posts disparaging VantageScore and making false or misleading statements about VantageScore's features." (*Id.* ¶ 69.)

- "These false and misleading statements confused and deceived or were likely to confuse and deceive a reasonable lender, business, and consumer concerning the characteristics of products and services sold by TransUnion and [FICO]." (*Id.* ¶ 147.)

- "[FICO] willfully disparaged the services and business of TransUnion and VantageScore when it, among other things when it made the statements described in paragraphs 66-71." (*Id.* ¶ 152.)

29.   The TransUnion Claim was timely tendered to Beazley under the Media Tech Policy.

30.   Beazley initially took the position that there was no coverage under the Media Tech Policy for the TransUnion Claim.

31.   In a letter dated August 28, 2019, Beazley reconsidered its coverage position and acknowledged its duty to defend the TransUnion Claim under the Media Tech Policy.

## THE TEN UNDERLYING LAWSUITS & BEAZLEY'S DENIAL OF COVERAGE

32.   Beginning on April 2, 2020, a series of similar putative class-action lawsuits were filed against FICO in the United States District Court for the Northern District of Illinois by alleged direct or indirect purchasers of FICO's scoring solutions.

33.   The following lawsuits are hereinafter referred to as the "Underlying Lawsuits":

   a.   *Sky Federal Credit Union v. Fair Isaac Corp.*, Case No. 20-cv-02114 (N.D. Ill) (filed on April 2, 2020) (hereinafter "*Sky Federal*");

   b.   *First Choice Federal Credit Union v. Fair Isaac Corp.*, No. 20-cv-02516 (N.D. Ill.) (filed on April 23, 2020) (hereinafter "*First Choice Federal*");

   c.   *Amalgamated Bank v. Fair Isaac Corp.*, Case No. 20-cv-02533 (N.D. Ill.) (filed on April 24, 2020) (hereinafter "*Amalgamated Bank*");

   d.   *Alcoa Community Federal Credit Union v. Fair Isaac Corp.*, Case No. 20-cv-02559 (N.D. Ill.) (filed on April 27, 2020) (hereinafter "*Alcoa Community*");

   e.   *Getten Credit Co. v. Fair Isaac Corp.*, Case No. 20-cv-02561 (N.D. Ill.) (filed on May 1, 2020) (hereinafter "*Getten Credit*");

Filed in District Court
State of Minnesota
3/1/2021 2:12 PM

   f.    *Kenmore NY Teachers Federal Credit Union v. Fair Isaac Corp.*, Case No. 20-cv-02755 (N.D. Ill.) (filed on May 6, 2020) (hereinafter "*Kenmore NY Teachers*");

   g.    *Alternative Finance, Inc., et al. v. Fair Isaac Corp.*, Case No. 20-cv-03204 (N.D. Ill.) (filed on May 29, 2020) (hereinafter "*Alternative Finance*");

   h.    *City of Boston Credit Union v. Fair Isaac Corp.*, Case No. 20-cv-03315 (N.D. Ill.) (filed on June 4, 2020) (hereinafter "*City of Boston Credit*")

   i.    *Holmes County Bank & Trust Co. v. Fair Isaac Corp.*, Case No. 20-cv-03395 (N.D. Ill.) (filed on June 9, 2020) (hereinafter "*Holmes County Bank*");

   j.    *Garner Properties & Management LLC v. Fair Isaac Corp.*, No. 20-cv-04575 (N.D. Ill.) (filed on August 6, 2020) (hereinafter "*Garner Properties*").

34.    The Underlying Lawsuits were all timely tendered to Beazley for coverage under the Media Tech Policy.

35.    The Underlying Lawsuits "aris[e] from the same or a series of related or repeated acts, errors or omissions, or from any continuing acts, errors or omissions" as those alleged in the TransUnion Claim.

36.    Accordingly, the Underlying Lawsuits and the TransUnion Claim constitute a single "Claim" under the Media Tech Policy, and the Underlying Lawsuits are deemed to have been made at the time of the TransUnion Claim, on February 12, 2018—within the policy period of the Media Tech Policy.

37.    Furthermore, as a single "Claim" under the Media Tech Policy, the TransUnion Claim and Underlying Lawsuits are subject to one aggregate limit of $15,000,000 and one retention of $2,000,000.

38.    Beazley does not dispute that the Underlying Lawsuits are deemed to be made within the policy period of the Media Tech Policy.

39.     Likewise, Beazley does not dispute that the TransUnion Claim and Underlying Lawsuits are subject to one aggregate limit of $15,000,000 and one retention of $2,000,000 under the Media Tech Policy.

40.     The Underlying Lawsuits trigger Beazley's duty to defend under the Media Tech Policy.

41.     The Underlying Lawsuits are "Claims" under Insuring Agreement F of the Media Tech Policy which allege that FICO committed covered wrongful acts on or after the Retroactive Date under the Media Tech Policy.

42.     The Underlying Lawsuits include allegations that that FICO engaged in one or more of the following acts in the course of FICO's performance of "**Professional Services**, **Media Activities** or **Technology Based Services**," as those terms are defined in the Media Tech Policy: defamation, libel, slander, product disparagement, trade libel, prima facie tort, infliction of emotional distress, outrage, outrageous conduct, or other tort related to the disparagement or harm to the reputation or character of any person or organization.

43.     The Underlying Lawsuits, likewise, include allegations of FICO's negligent acts, errors, omissions, misstatements, misleading statements, and/or breach of duty in rendering or failure to render "**Professional Services**" as defined in the Media Tech Policy.

44.     For example, the underlying *Alternative Finance* complaint alleges:

- FICO "waged a disparaging public relations and advertising campaign to create uncertainty about the reliability of VantageScores." (*Alternative Finance* Compl. ¶ 6.)

- "[FICO] has engaged in a media campaign against VantageScore and other credit scoring alternatives, including making false and misleading statements about such alternatives in order to sow doubt about VantageScore's and other credit scoring systems' reliability." (*Id.* ¶ 63.)

- "[FICO] has waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead business-customers in the

Business Market about the qualities and characteristics of FICO Scores, VantageScore, and other competing credit score products." (*Id.* ¶ 78.)

- "In advertisements, letters and blog posts, [FICO] disparaged VantageScore and other credit scoring systems by calling them 'Fako' scores, falsely claimed that VantageScore and other alternative scoring systems do not reliably measure creditworthiness, and misrepresented the information considered by VantageScore and other credit scoring systems." (*Id.*)

- "[O]n December 12, 2017, [FICO] took out a full-page advertisement in the *Wall Street Journal* addressed to 'Lenders, Policymakers and Consumer Advocates' that disparaged VantageScore without identifying it by name." (*Id.* ¶ 79.)

- "The *Wall Street Journal* advertisement directed readers to 'Learn more at FICO.com/independent,' a [FICO]-owned website that connects visitors to articles and blog posts that disparage VantageScore by name." (*Id.* ¶ 80.)

- "[FICO's] public website includes numerous posts disparaging VantageScore and other credit scoring products and making false or misleading statements about those products' features." (*Id.* ¶ 81.)

- "[FICO's] media and advertising campaign against VantageScore has been successful in sowing fear, uncertainty, and doubt about credit scoring alternatives in marketplace. Media sources, financial blogs, and consumers have absorbed [FICO's] message that any credit score other than a FICO Score is a 'Fako' score." (*Id.* ¶ 82.)

- "The public statements described in the foregoing paragraphs were transmitted and seen by a substantial number of businesses and consumers nationwide." (*Id.* ¶ 85.)

45.    These allegations or substantially similar allegations are present in all of the Underlying Lawsuits.

46.    At least nine of the Underlying Lawsuits, including *Alternative Finance*, *Amalgamated Bank*, *City of Boston Credit*, *First Choice Federal*, *Garner Properties*, *Getten Credit*, *Holmes County Bank*, *Kenmore NY Teachers*, and *Sky Federal* seek injunctive relief, triggering Beazley's duty to defend under Section II.A.2. of the Media Tech Policy, which states that Beazley has a duty to defend "any **Claim** in the form of a civil suit against the Insured that seeks injunctive relief (meaning a temporary restraining order or a preliminary or permanent injunction) for one or more of the acts listed in Insuring Agreement F . . . ."

10

47.     Some of the Underlying Lawsuits plead claims of unjust enrichment, including *Alternative Finance* and *Garner Properties*. The allegations for these claims incorporate the other alleged wrongful acts in the complaints and contend that purchasers of FICO Scores were damaged by having to pay too much for FICO's scoring solutions.

48.     The exclusions of the Media Tech Policy do not apply and do not negate Beazley's duty to defend FICO in the Underlying Lawsuits.

49.     Exclusion A of the Media Tech Policy expressly states that where the insured is alleged to have engaged in an intentional or knowing violation of the law, the Media Tech Policy "shall apply to **Claims Expenses** incurred in defending any such **Claim** . . . until such time as there is a final adjudication, judgment, binding arbitration decision or conviction against the Insured, or written admission by the **Insured**, establishing such conduct . . . ."

50.     There has not been any such final adjudication, judgment, binding arbitration decision, conviction, or written admission by FICO, and the Underlying Lawsuits are all ongoing, yet Beazley has still refused to defend and refused to pay "**Claims Expenses**" in excess of the $2 million retention for the Underlying Lawsuits.

51.     The TransUnion Litigation has now settled, including the resolution of the TransUnion Claim.

52.     FICO incurred substantial "**Claim Expenses**" in the TransUnion Litigation, including to defend against the TransUnion Claim.

53.     Pursuant to communications between counsel for FICO and Beazley on November 17, 2020, FICO and Beazley have agreed to the amount of fees, costs, and expenses FICO incurred in the TransUnion Litigation which have eroded the $2,000,000 retention under the Media Tech Policy.

54.    The amount remaining on the $2,000,000 retention under the Media Tech Policy is already, or will soon be, fully eroded by the "**Claim Expenses**" FICO has incurred and is incurring to defend the Underlying Lawsuits and the amount of the retention eroded as a result of the TransUnion Claim.

55.    Beazley has denied coverage for the Underlying Lawsuits under the Media Tech Policy.

56.    Beazley's denial of coverage is wrongful and in breach of the Media Tech Policy.

57.    Because Beazley has denied coverage for all of the Underlying Lawsuits, and FICO contends that Beazley is in breach of its insurance contract, including by breaching its duty to defend, there is a justiciable controversy between Beazley and FICO.

## COUNT ONE
### (Breach of Contract—Breach of Duty to Defend)

58.    FICO incorporates and reasserts herein all of the foregoing paragraphs.

59.    The Media Tech Policy is a contract.

60.    Beazley has a duty to defend the Underlying Lawsuits under the terms of the Media Tech Policy, which are met.

61.    Beazley has breached the Media Tech Policy by repudiating and denying Beazley's duty to defend the Underlying Lawsuits.

62.    As a direct and proximate result of Beazley's breach of its duty to defend FICO in connection with the Underlying Lawsuits under the Media Tech Policy, FICO has been damaged and will suffer damages in excess of $50,000 exclusive of interest and costs.

## COUNT TWO
### (Declaratory Judgment—Breach of Duty to Defend)

63.    FICO incorporates and reasserts herein all of the foregoing paragraphs.

12

64.    Beazley has repudiated and denied any duty to defend FICO with respect to the Underlying Lawsuits under the Media Tech Policy.

65.    FICO disputes and has challenged Beazley's denial of coverage.

66.    An actual and justiciable controversy exists between FICO and Beazley with respect to Beazley's duty to defend FICO under the Media Tech Policy for the Underlying Lawsuits.

67.    FICO is entitled to a declaration of Beazley's obligations and duties to defend FICO with respect to the Underlying Lawsuits under the Media Tech Policy.

<u>COUNT THREE</u>
**(Declaratory Judgment—Duty to Indemnify)**

68.    FICO incorporates and reasserts herein all of the foregoing paragraphs.

69.    Beazley has repudiated and denied any duty to indemnify FICO with respect to the Underlying Lawsuits under the Media Tech Policy.

70.    FICO disputes and has challenged Beazley's denial of coverage.

71.    An actual and justiciable controversy exists between FICO and Beazley with respect to Beazley's duty to indemnify FICO under the Media Tech Policy for the Underlying Lawsuits.

72.    FICO is entitled to a declaration of Beazley's obligations and duties to indemnify FICO with respect to the Underlying Lawsuits under the Media Tech Policy.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, FICO requests judgment and declaratory relief in its favor and against Beazley, providing FICO with the following:

a.    An award of compensatory damages resulting from Beazley's breach of its duties to defend and indemnify FICO in the Underlying Lawsuits;

b.   All damages allowed by law, including all consequential damages flowing from Beazley's breach of its duties under the Media Tech Policy and applicable law;

c.   A declaration of FICO's rights and Beazley's duties under the Media Tech Policy in connection with the Underlying Lawsuits;

d.   A declaration that Beazley must provide FICO with a full defense in the Underlying Lawsuits;

e.   A declaration that Beazley is obligated to indemnify FICO in connection with the Underlying Lawsuits;

f.   All interest on the above-described amounts allowed by law, including prejudgment interest under Minn. Stat. § 60A.0811;

g.   All attorneys' fees, costs, and expenses allowed by law, including FICO's coverage-action fees; and

h.   Such other and further relief as the Court deems necessary, just, or proper.

## DEMAND FOR JURY TRIAL

FICO demands a trial by jury on all issues so triable.

Dated: February 15, 2021

Respectfully submitted,

By: _____

**MASLON LLP**
Rikke Dierssen-Morice (#0237826)
Bryan R. Freeman (#3087154)
Judah A. Druck (#0397764)
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 672-8200
rikke.morice@maslon.com
bryan.freeman@maslon.com
judah.druck@maslon.com
**ATTORNEYS FOR PLAINTIFF**

14

Filed in District Court
State of Minnesota
3/1/2021 2:12 PM

## **ACKNOWLEDGEMENT**

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney

and witness fees may be awarded pursuant to Minnesota Statute § 549.211, subdivision 3, to the

parties against whom the allegations in this Complaint are asserted.

Dated: February 15, 2021

Rikke Dierssen-Morice

# DECLARATIONS

## AFB MEDIA TECH®

## PROFESSIONAL AND TECHNOLOGY BASED SERVICES, TECHNOLOGY PRODUCTS, INFORMATION SECURITY & PRIVACY, AND MULTIMEDIA AND ADVERTISING LIABILITY INSURANCE POLICY

**COVERAGE UNDER THIS POLICY IS PROVIDED ON A CLAIMS MADE AND REPORTED BASIS AND APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR THE OPTIONAL EXTENSION PERIOD (IF APPLICABLE) AND REPORTED TO THE UNDERWRITERS DURING THE POLICY PERIOD OR AS OTHERWISE PROVIDED IN CLAUSE IX. OF THIS POLICY.  AMOUNTS INCURRED AS CLAIMS EXPENSES UNDER THIS POLICY SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO RETENTIONS.**

These Declarations along with the completed and signed **Application** and the Policy with endorsements shall constitute the contract between the **Insureds** and the Underwriters.

**Underwriters:**     Syndicate 2623/623 at Lloyd's

**Policy Number:**     ████████1201

**Authority Reference Number:** ████████████████

Item 1.    **Named Insured:** Fair Isaac Corporation

   **Address:**  Rosedale Corporate Plaza, 2665 Long Lake Road, Building C

   Roseville, MN 55113

Item 2.    **Policy Period:**

   **From:**    12-Nov-2017

   **To:**    12-Nov-2018

   Both dates at 12:01 a.m. Local Time at the Address stated in Item 1.

Item 3.    **Limit of Liability:**

   A. **Policy Aggregate Limit of Liability**:    $15,000,000
   (Aggregate for all coverages combined, including **Claims Expenses)** but sublimited to:

   B. Aggregate sublimit of liability applicable to Insuring    $2,000,000
   Agreement D. (Privacy Notification Costs):

   C. Aggregate sublimit of liability applicable to Insuring    $2,000,000
   Agreement E. (Regulatory Defense and Penalties):

Complaint, Exhibit A

Item 4.    **RETENTIONS:**

    A.  Each **Claim Retention** (including each **Claim** in the form of a **Regulatory Proceeding**), includes **Claims Expenses**:                                                                  $2,000,000

    B.  Insuring Agreement D. (Privacy Notification Costs)

        Each incident, event or related incidents or events giving rise to an obligation to pay **Privacy Notification Costs**:                                          $1,000,000

Item 5.    **Premium**              $

Item 6.    **Retroactive & Continuity Dates:**

    A.  Retroactive Date                                         See Endorsement
                                                                              EFI008112012

    B.  Continuity Date                                          12-Nov-2006

Item 7.    **Optional Extension Period:**

    A.  Premium for **Optional Extension Period:**       See Endorsement E03449122011

    B.  Length of **Optional Extension Period:**        See Endorsement E03449122011

Item 8.    Notification under this Policy:

        (a) Beazley Group
        Attn:  Beth Diamond
        1270 Avenue of the Americas
        Suite 1200
        New York, NY 10020
        Tel: (646) 943-5900
        Fax: (646) 378-4039
        Email:  tmbclaims@beazley.com

        (b)  All other notices under this Policy shall be given to
        Beazley USA Services, Inc.
        30 Batterson Park Road
        Farmington, CT 06032
        Tel:  (860) 677-3700
        Fax: (860) 679-0247
        (All Claims should be reported in accordance with 8.(a) above)

Item 9.    Terrorism Coverage: N/A

Item 10.   Service of process in any suit shall be made upon:

        Mendes & Mount LLP
        750 7th Ave, #24
        New York, NY 10019

**Complaint, Exhibit A**

Item 11.    Choice of Law: New York

Item 12.    Endorsements Effective At Inception:

| | | |
|---|---|---|
| 1. | SCHEDULE2017 | Lloyd's Security Schedule 2017 |
| 2. | E02804032011 | Sanction Limitation And Exclusion Clause |
| 3. | NMA1256 | Nuclear Incident Exclusion Clause-Liability-Direct (Broad) (U.S.A.) |
| 4. | NMA1477 | Radioactive Contamination Exclusion Clause-Liability-Direct (U.S.A.) |
| 5. | NMA2918 | War and Terrorism Exclusion Endorsement |
| 6. | EFI003112012 | Amend Professional Services And Technology Products |
| 7. | EFI007112012 | Amend Exclusion S.3. (Credit Scoring Discrimination) |
| 8. | EFI008112012 | Separate Retroactive Dates Per Insuring Agreement |
| 9. | EFI012112012 | Amend Insuring Agreement A. |
| 10. | EFI013112012 | Managed Care Exclusion |
| 11. | E03259102011 | Amend Subrogation Clause |
| 12. | E03398112011 | Additional Insured Endorsement |
| 13. | E03449122011 | Optional Extension Period Amendment |
| 14. | EFI002112009 | Fair Isaac Prior And Pending Litigation Exclusion |

Dated:       03-Jan-2018

At:          30 Batterson Park Road
             Farmington
             Connecticut 06032                    by _____
             (the office of the Correspondent)         Beazley USA Services, Inc. (Correspondent)

Complaint, Exhibit A



**LLOYD'S SECURITY SCHEDULE**

Syndicate 2623     82%
Syndicate 623      18%

ALL OTHER TERMS, conditions and limitations of said Certificate shall remain unchanged.

Filed in District Court
State of Minnesota
3/1/2021 2:12 PM

**Effective date of this Endorsement: 12-Nov-2016**
**This Endorsement is attached to and forms a part of Policy Number:** ███████████
**Syndicate 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

### SANCTION LIMITATION AND EXCLUSION CLAUSE

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH®**

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, law or regulations of the European Union, United Kingdom or United States of America.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E02804                                                    Page 1 of 1
032011 ed.

Complaint, Exhibit A

Filed in District Court
State of Minnesota
3/1/2021 2:12 PM

**Effective date of this Endorsement: 12-Nov-2016**
**This Endorsement is attached to and forms a part of Policy Number:** ███████

## NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH®**

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause- Liability-Direct (Limited) applies.

This Policy* does not apply:

I.      Under any Liability Coverage, to injury, sickness, disease, death or destruction:

    (a)     with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (b)     resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.     Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

    (a)     the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

    (b)     the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

Complaint, Exhibit A

(c)    the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.    As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or by-product material;

"source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means:

(a)    any nuclear reactor,

(b)     any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.  With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

Complaint, Exhibit A

Filed in District Court
State of Minnesota
3/1/2021 2:12 PM

**Effective date of this Endorsement: 12-Nov-2016**
**This Endorsement is attached to and forms a part of Policy Number:** ███████

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH®**

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA1477

Page 1 of 1

**Effective date of this Endorsement: 12-Nov-2016**
**This Endorsement is attached to and forms a part of Policy Number:** ▉▉▉▉▉▉▉

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH®**

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1. war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2. any act of terrorism.

    For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

Complaint, Exhibit A

**Effective date of this Endorsement: 12-Nov-2016**
**This Endorsement is attached to and forms a part of Policy Number:** ▓▓▓▓▓▓
**Syndicate 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>AMEND PROFESSIONAL SERVICES, TECHNOLOGY BASED SERVICES
AND TECHNOLOGY PRODUCTS</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**®

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.     Clause VI., Definitions, paragraph DD. "**Professional Services**" is deleted in its entirety and replaced with the following:

DD.     "**Professional Services**" means the following services performed for others by or on behalf of the **Insured Organization** for a fee (or for free if provided in conjunction with other fee based services or products provided for compensation or to potential or existing customers as an encouragement to purchase such products or services):

1.     Strategy Machine Solutions for marketing, originations, customer management, fraud, collections and recovery, mortgage banking, insurance and health care, and consumers;

2.     Scoring solutions: FICO scores, Qualify scores, marketing and bankruptcy scores, commercial credit risk scores, insurance scores, and ScoreNet and PreScore services; and

3.     Professional services, including solution and technology consulting, business strategy consulting, industry consulting, strategy science, predictive science, fraud consulting, and Blaze Advisor;

but does not include **Technology Products** or work or activities performed by or on behalf of the **Insured Organization** as an accountant, architect, health care provider, lawyer, insurance or real estate agent or broker, or a civil or structural engineer.

2.     Clause VI., Definitions, paragraph KK. "**Technology Products**" is deleted in its entirety and replaced with the following:

KK.     **Technology Based Services** means computer and electronic technology services, including data processing, Internet services, data and application hosting, computer systems analysis, technology consulting and training, custom software programming for a specific client of the **Insured Organization**, computer and software systems installation and integration, computer and software support, and network management services performed by the **Insured**, or by others acting under the **Insured Organization's** trade name, for others for a fee (or for free if provided in conjunction with other fee based services or products provided for compensation or to potential or existing customers as an encouragement to purchase such products or services), but shall not mean **Technology Products**.

3.     Clause VI., Definitions, paragraph LL. "**Technology Products**" is deleted in its entirety and replaced with the following:

Complaint, Exhibit A

LL.    **Technology Products** means a computer or telecommunications hardware or software product, including analytical software tools, software products provided as part of Strategy Machine Solutions, Scoring Solutions or software provided in conjunction with other **Professional Services**, or related electronic product that is created, manufactured or developed by the **Insured Organization** for others, or distributed, licensed, leased or sold by the **Insured Organization** to others, for compensation, or for free if provided in conjunction with other fee based services or products provided for compensation or to potential or existing customers as an encouragement to purchase such products or services, including software updates, service packs and other maintenance releases provided for such products.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Complaint, Exhibit A**

**Effective date of this Endorsement: 12-Nov-2016**
**This Endorsement is attached to and forms a part of Policy Number:** ▮▮▮▮▮▮▮▮
**Syndicate 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**AMEND EXCLUSION S.3. (CREDIT SCORING DISCRIMINATION)**</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**®

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Clause V. Exclusions S.3. shall not apply to **Claims Expenses** resulting from any **Claim** arising out of the **Insured Organization's** provision of credit scoring services to third parties for a fee, provided any coverage shall be subject to a $2,000,000 limit of liability in the aggregate for the **Policy Period**, in excess of the **Retention**, and shall be part of, and not in addition to, the overall limits of liability referred to in Items 3.A. and 3.C. of the Declarations.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

EFI007
112012 ed.                                                                                         Page 1 of 1

Complaint, Exhibit A

**Effective date of this Endorsement: 12-Nov-2016**
**This Endorsement is attached to and forms a part of Policy Number:** ▇▇▇▇▇▇▇
**Syndicate 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>**SEPARATE RETROACTIVE DATES PER INSURING AGREEMENT**</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**®

.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Item 6.A
of the Declarations is deleted and replaced with the following

| Item 6.A. | Retroactive Date |
| --- | --- |
| For claims under Insuring Agreements A and B, provided if a claim is also covered under Insuring Agreements C., D., E. or F., such a claim will be subject to the **Retroactive Dates** set forth below for those coverages. | **30 September 1990** |
| For **Claims** under Insuring Agreement C.2. | **30 September 2002** |
| For **Claims** under Insuring Agreements C.1., C.3., C.4., C.5., D. or E. | **12 November 2006** |
| For Claims under Insuring Agreement F., except: | **12 November 2002** |
| for the offenses listed in Insuring Agreement F.6 – F.9 other than claims resulting from the **Insured Organization's Media Material** provided on or through the internet or in **Advertising**; and | **12 November 2006** |
| for any claim arising out of misappropriation of trade secret | **12 November 2006** |
| For claims under the endorsement EFI007112012 (Credit Scoring Discrimination): | **12 November 2010** |

Complaint, Exhibit A

Filed in District Court
State of Minnesota
3/1/2021 2:12 PM

All other terms and conditions of this Policy remain unchanged.

_____

Authorized Representative

**Complaint, Exhibit A**

**Effective date of this Endorsement: 12-Nov-2016**
**This Endorsement is attached to and forms a part of Policy Number:** ▮▮▮▮▮▮▮▮
**Syndicate 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>AMEND INSURING AGREEMENT A.</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**®

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Insuring Agreement A. is deleted and replaced with the following:

A.      **Professional and Technology Based Services Coverage**

To pay on behalf of the **Insured**:

**Damages** and **Claims Expenses**, in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of any **Claim** first made against any **Insured** during the **Policy Period** or **Optional Extension Period** (if applicable) and reported to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. of this Policy, arising out of any (1) negligent act, error, omission, misstatement, misleading statement, breach of duty, (2) unintentional breach of contract, or (3) violation of the following laws:

1.      the Fair Credit Reporting Act 15 U.S.C. Section 1681 ("FCRA");

2.      the Credit Repair Organizations Act, 15 U.S.C. Section 1679;

3.      the Fair Debt Collection Practices Act 15 U.S.C. 1692 ("FDCPA"); or

4.      any similar federal or laws of any state of the United States of America or any amendments to such Acts or any code changes, or any similar laws of any other country

in rendering or failure to render **Professional Services** or **Technology Based Services** on or after the **Retroactive Date** set forth in Item 6.A. of the Declarations and before the end of the **Policy Period** by the **Insured** or by any person for whose negligent act, error, omission, misstatement, misleading statement, breach of duty, unintentional breach of contract, or violation of the above referenced laws the **Insured Organization** is legally responsible.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

Complaint, Exhibit A

**Effective date of this Endorsement: 12-Nov-2016**
**This Endorsement is attached to and forms a part of Policy Number:** ▮▮▮▮▮▮▮▮
**Syndicate 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>MANAGED CARE EXCLUSION</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**[®]

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the coverage under this Insurance does not apply to any **Claim** or **Loss** for, in connection with, resulting from or arising out of any managed care organization business activities, including services or activities performed in the administration or management of health care plans; advertising, marketing or selling health care plans or health care products; handling, reviewing, investigating or adjusting claims for benefits or coverages under health care plans; utilization review; or establishing health care provider networks.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

EFI013
112012 ed.

Page 1 of 1

**Complaint, Exhibit A**

**Effective date of this Endorsement: 12-Nov-2016**
**This Endorsement is attached to and forms a part of Policy Number:** █████████
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the
"Underwriters"**

<u>AMEND SUBROGATION CLAUSE</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**®

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:
Clause XVIII. Subrogation is deleted in its entirety and replaced with the following:

If any payment is made under this Policy and there is available to the Underwriters any of the
**Insured's** rights of recovery against any other party, then the Underwriters shall maintain all such
rights of recovery.   The **Insured** shall execute and deliver instruments and papers and do
whatever else is necessary to secure such rights. The **Insured** shall do nothing to prejudice such
rights without the Underwriters' prior written approval.    If the **Insured** has waived its right to
subrogate against a third party through written agreement made before the **Claim** is made, then
the Underwriters waive their rights to subrogation against such third party.   Any recoveries shall
be applied first to subrogation expenses, second to **Loss** paid by the Underwriters, and lastly to
the **Retention**.  Any additional amounts recovered shall be paid to the **Named Insured**.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

Complaint, Exhibit A

**Effective date of this Endorsement: 12-Nov-2016**
**This Endorsement is attached to and forms a part of Policy Number:** ████████
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>ADDITIONAL INSURED ENDORSEMENT</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**®

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.      Clause **III. THE INSURED AND THE INSURED ORGANIZATION** is amended by the addition of the following:

An **Additional Insured**, but only for acts, errors or omissions of the **Insured Organization** otherwise covered by the terms of this Insurance.

2.      Clause **V. EXCLUSIONS** P. is deleted and replaced with the following:

P.      For, arising out of or resulting from a **Claim** by or on behalf of one or more **Insureds** under this Insurance against any other **Insured** or **Insureds** under this Insurance; provided this exclusion shall not apply to an otherwise covered **Claim** under Insuring Agreements C.1., C.2., or C.3. made by a current or former employee of the **Insured Organization** or any **Claim** by or on behalf of an **Additional Insured**;

3.      Clause **VI. DEFINTIONS** is amended by the addition of the following:

**Additional Insured** means:

1.      any natural person or entity that the **Insured Organization** has expressly agreed in writing to add as an **Additional Insured** under this policy prior to the commission of any act for which such person or entity would be provided coverage for under this Policy, but only to the extent the **Insured Organization** would have been liable and coverage would have been afforded under the terms and conditions of this Policy had such **Claim** been made against the **Insured Organization**; and

2.      any other person or entity added an **Additional Insured** by endorsement to this Policy.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E03398                                                                                                              Page 1 of 1
112011 ed.

**Complaint, Exhibit A**

**Effective date of this Endorsement: 12-Nov-2016**
**This Endorsement is attached to and forms a part of Policy Number:** ████████
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the "Underwriters"**

**OPTIONAL EXTENSION PERIOD AMENDMENT**

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH®**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Item 7. of the Declarations is deleted and replaced with the following:

Item 7.   **Optional Extension Period**

A.   Premium for **Optional Extension Period:**

| Premium for **Optional Extension Period:** | Length of **Optional Extension Period:** |
|---|---|
| 100% of the Premium set forth in Item 5. of the Declarations | 12 months |
| 175% of the Premium set forth in Item 5. of the Declarations | 24 months |
| 225% of the Premium set forth in Item 5. of the Declarations | 36 months |

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E03449
122011 ed.

Page 1 of 1

**Effective date of this Endorsement: 12-Nov-2016**
**This Endorsement is attached to and forms a part of Policy Number:** ████████████
**Syndicate 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**FAIR ISAAC PRIOR AND PENDING LITIGATION EXCLUSION**</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH®**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Clause V., Exclusions, is amended to include:

Based upon, arising out of or resulting directly or indirectly from or in consequence of, or in any way involving:

1.    any prior or pending litigation as of 12:01 a.m. Local Time on 12 November 2006, including but not limited to the *Fair Isaac v. Equifax, et al.* litigation (U.S.D.C. Minn.), and including any cross claims, counter-claims or any other claims or litigation arising out of, relating to or made in response to the *Fair Isaac v. Equifax, et al.* claim, whether made before or after the inception date;

2.    any fact, circumstance, situation, transaction or event underlying or alleged in such claim or litigation, regardless of the legal theory upon which such claim is predicated;

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

Complaint, Exhibit A

**CERTIFICATE PROVISIONS**



# Lloyd's Insurance

**This Insurance** is effected with certain Underwriters at Lloyd's, London.

**This Certificate** is issued in accordance with the limited authorization granted to the Correspondent by certain Underwriters at Lloyd's, London whose syndicate numbers and the proportions underwritten by them can be ascertained from the office of the said Correspondent (such Underwriters being hereinafter called "Underwriters") and in consideration of the premium specified herein, Underwriters hereby bind themselves severally and not jointly, each for his own part and not one for another, their Executors and Administrators.

**The Assured** is requested to read this Certificate, and if it is not correct, return it immediately to the Correspondent for appropriate alteration.

All inquiries regarding this Certificate should be addressed to the following Correspondent:

SLC-3 (USA) NMA2868 (24/08/00) Printed by the Corporation of Lloyd's.

**Complaint, Exhibit A**

1. **Signature Required.** This Certificate shall not be valid unless signed by the Correspondent on the attached Declaration Page.

2. **Correspondent Not Underwriters.** The Correspondent is not an Underwriter hereunder and neither is nor shall be liable for any loss or claim whatsoever. The Underwriters hereunder are those Underwriters at Lloyd's, London whose syndicate numbers can be ascertained as hereinbefore set forth. As used in this Certificate "Underwriters" shall be deemed to include incorporated as well as unincorporated persons or entities that are Underwriters at Lloyd's, London.

3. **Cancellation.** If this Certificate provides for cancellation and this Certificate is cancelled after the inception date, earned premium must be paid for the time the insurance has been in force.

4. **Assignment.** This Certificate shall not be assigned either in whole or in part without the written consent of the Correspondent endorsed hereon.

5. **Attached Conditions Incorporated.** This Certificate is made and accepted subject to all the provisions, conditions and warranties set forth herein, attached or endorsed, all of which are to be considered as incorporated herein.

6. It is hereby understood and agreed that wherever the word 'Policy' appears herein it shall be deemed to read 'Certificate.'

**Complaint, Exhibit A**



**AFB MEDIA TECH®**

**PROFESSIONAL AND TECHNOLOGY BASED SERVICES, TECHNOLOGY PRODUCTS, INFORMATION SECURITY & PRIVACY, AND MULTIMEDIA AND ADVERTISING LIABILITY INSURANCE POLICY**

**NOTICE:  COVERAGE UNDER THIS POLICY IS PROVIDED ON A CLAIMS MADE AND REPORTED BASIS AND APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR THE OPTIONAL EXTENSION PERIOD (IF APPLICABLE) AND REPORTED TO THE UNDERWRITERS DURING THE POLICY PERIOD OR AS OTHERWISE PROVIDED IN CLAUSE IX. OF THIS POLICY.  AMOUNTS INCURRED AS CLAIMS EXPENSES UNDER THIS POLICY SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO RETENTIONS.**

Please review the coverage afforded under this Insurance Policy carefully and discuss the coverage hereunder with your insurance agent or broker.

The Underwriters agree with the **Named Insured**, set forth in Item 1. of the Declarations made a part hereof, in consideration of the payment of the premium and reliance upon the statements in the **Application** to this Insurance Policy (hereinafter referred to as the "Policy" or "Insurance") and subject to all the provisions, terms and conditions of this Policy:

I.      **INSURING AGREEMENTS**

     A.      **Professional and Technology Based Services Liability**

          To pay on behalf of any **Insured**:

          **Damages** and **Claims Expenses**, in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of any **Claim** first made against any **Insured** during the **Policy Period** or **Optional Extension Period** (if applicable) and reported in writing to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. of this Policy, arising out of any negligent act, error or omission, or any unintentional breach of contract, in rendering or failure to render **Professional Services** or **Technology Based Services** on or after the **Retroactive Date** set forth in Item 6.A. of the Declarations and before the end of the **Policy Period** by the **Insured** or by any person for whose negligent act, error or omission or unintentional breach of contract the **Insured Organization** is legally responsible.

Complaint, Exhibit A

Filed in District Court
State of Minnesota
3/1/2021 2:12 PM

B.     **Technology Products Liability**

To pay on behalf of any **Insured**:

**Damages** and **Claims Expenses**, in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of any **Claim** first made against any **Insured** during the **Policy Period** or **Optional Extension Period** (if applicable) and reported to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. of this Policy, arising out of:

1.     any negligent act, error or omission, or any unintentional breach of contract, by the **Insured** on or after the **Retroactive Date** set forth in Item 6.A. of the Declarations and before the end of the **Policy Period** that results in the failure of **Technology Products** to perform the function or serve the purpose intended; or

2.     infringement of copyright committed by the **Insured** on or after the **Retroactive Date** set forth in Item 6.A. of the Declarations and before the end of the **Policy Period** with respect to software **Technology Products**.

C.     **Information Security & Privacy Liability**

To pay on behalf of the **Insured**:

**Damages** and **Claims Expenses**, in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of any **Claim**, including a **Claim** for violation of a **Privacy Law**, first made against any **Insured** during the **Policy Period** or **Optional Extension Period** (if applicable) and reported in writing to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. of this Policy, for:

1.     theft, loss, or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information** or **Third Party Corporate Information** that is in the care, custody or control of the **Insured Organization**, or a third party for whose theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information** or **Third Party Corporate Information** the **Insured Organization** is legally responsible (a third party shall include a Business Associate as defined by the Health Insurance Portability and Accountability Act ("HIPAA")), provided such theft, loss or **Unauthorized Disclosure** first takes place on or after the **Retroactive Date** and before the end of the **Policy Period**;

2.     one or more of the following acts or incidents that directly result from a failure of **Computer Security** to prevent a **Security Breach**, provided that such act or incident first takes place on or after the **Retroactive Date** and before the end of the **Policy Period**;

Complaint, Exhibit A

(a)      the alteration, corruption, destruction, deletion, or damage to a **Data Asset** stored on **Computer Systems**;

(b)      the failure to prevent transmission of **Malicious Code** from **Computer Systems** to **Third Party Computer Systems**; or

(c)      the participation by the **Insured Organization's Computer System** in a **Denial of Service Attack** directed against a **Third Party Computer System**;

3.      the **Insured Organization's** failure to timely disclose an incident described in C.1 or C.2. above in violation of any **Breach Notice Law**; provided such incident giving rise to the **Insured Organization's** obligation under a **Breach Notice Law** must first take place on or after the **Retroactive Date** and before the end of the **Policy Period**;

4.      failure by the **Insured** to comply with that part of a **Privacy Policy** that specifically:

(a)      prohibits or restricts the **Insured Organization's** disclosure, sharing or selling of a person's **Personally Identifiable Non-Public Information**;

(b)      requires the **Insured Organization** to provide access to **Personally Identifiable Non-Public Information** or to correct incomplete or inaccurate **Personally Identifiable Non-Public Information** after a request is made by a person;

(c)      mandates procedures and requirements to prevent the loss of **Personally Identifiable Non-Public Information**;

(d)      prevents or prohibits improper or intrusive collection of **Personally Identifiable Non-Public Information** from a person;

(e)      requires notice to a person of the **Insured Organization's** collection or use of, or the nature of the collection or use of his or her **Personally Identifiable Non-Public Information**; or

(f)      provides a person with the ability to assent to or withhold assent for (e.g. opt-in or opt-out) the **Insured Organization's** collection or use his or her **Personally Identifiable Non-Public Information**;

provided the acts, errors or omissions that constitute such failure to comply with a **Privacy Policy** must first take place on or after the **Retroactive Date** and before the end of the **Policy Period**,

Complaint, Exhibit A

and the **Insured Organization** must, at the time of such acts, errors or omissions, have in force a **Privacy Policy** that directly addresses those subsections above that are relevant to such **Claim**; or

5.    failure by the **Insured** to administer (a) an identity theft prevention program required by regulations and guidelines promulgated pursuant to 15 U.S.C. §1681m(e), as amended, or (b) an information disposal program required by regulations and guidelines promulgated pursuant to 15 U.S.C. §1681W, as amended; provided the acts, errors or omissions that constitute such failure must first take place on or after the **Retroactive Date** and before the end of the **Policy Period**.

D.    **Privacy Notification Costs**

To pay the **Named Insured** for:

**Privacy Notification Costs**, in excess of the **Retention** and incurred by the **Insured Organization** with the Underwriters' prior written consent, resulting from the **Insured Organization's** legal obligation to comply with a **Breach Notice Law** because of an incident (or reasonably suspected incident) described in Insuring Agreement C.1. or C.2. that first takes place on or after the **Retroactive Date** and before the end of the **Policy Period**, is discovered by the **Insured** during the **Policy Period**, and is reported to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. of this Policy.

**Privacy Notification Costs** means the following reasonable and necessary costs incurred by the **Insured Organization** within one (1) year of the reporting of the incident or suspected incident to the Underwriters:

1.    to hire a computer security expert to determine the existence and cause of any electronic data breach resulting in an actual or reasonably suspected theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information** which may require the **Insured Organization** to comply with a **Breach Notice Law** and to determine the extent to which such information was accessed by an unauthorized person or persons; and for fees charged by an attorney to determine the applicability of and actions necessary by the **Insured Organization** to comply with **Breach Notice Law** due to an actual or reasonably suspected theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information**;

2.    to provide notification to:

(a)    individuals who are required to be notified by the applicable **Breach Notice Law**; and

Complaint, Exhibit A

(b)     in the Underwriters' discretion, to individuals affected by an incident in which their **Personally Identifiable Non-Public Information** has been subject to theft, loss, or **Unauthorized Disclosure** in a manner which compromises the security or privacy of such individual by posing a significant risk of financial, reputational or other harm to the individual;

3.     up to one hundred thousand United States dollars (USD 100,000) for the costs of a public relations consultancy for the purpose of averting or mitigating material damage to the **Insured Organization's** reputation, subject to twenty percent (20%) coinsurance; and

4.     in connection with a credit file monitoring program, to be approved by the Underwriters, consisting of:

(a)     the offering of one (1) year of credit monitoring services to those individuals whose **Personally Identifiable Non-Public Information** was compromised or reasonably believed to be compromised as a result of theft, loss or **Unauthorized Disclosure** of information giving rise to the notification of such individuals pursuant to Insuring Agreement D.2.; and

(b)     mailing and other reasonable third party administrative costs associated with such a program;

provided, all such costs payable under this subsection 4. must be for the purpose of mitigating potential **Damages** resulting from such incident.

**Privacy Notification Costs** will be paid in excess of the applicable **Retention** and shall not include any internal salary or overhead expenses of the **Insured Organization**.

E.    **Regulatory Defense and Penalties**

To pay on behalf of the **Insured**:

**Claims Expenses** and **Penalties** in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of any **Claim** in the form of a **Regulatory Proceeding**, first made against any **Insured** during the **Policy Period** or **Optional Extension Period** (if applicable) and reported in writing to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. of this Policy, resulting from a violation of a **Privacy Law** and caused by an incident described in Insuring Agreement C.1., C.2. or C.3 that first takes place on or after the **Retroactive Date** and before the end of the **Policy Period.**

Filed in District Court
State of Minnesota
3/1/2021 2:12 PM

F.      **Multimedia and Advertising Liability**

To pay on behalf of the **Insured**:

**Damages** and **Claims Expenses**, in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of liability imposed by law or **Assumed Under Contract** resulting from any **Claim** first made against any **Insured** during the **Policy Period** or **Optional Extension Period** (if applicable) and reported to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. of this Policy, for one or more of the following acts first committed on or after the **Retroactive Date** set forth in Item 6.A. of the Declarations and before the end of the **Policy Period** in the course of the **Insured Organization's** performance of **Professional Services**, **Media Activities** or **Technology Based Services**:

1.      defamation, libel, slander, product disparagement, trade libel, prima facie tort, infliction of emotional distress, outrage, outrageous conduct, or other tort related to disparagement or harm to the reputation or character of any person or organization;

2.      invasion of or interference with the right to privacy or of publicity;

3.      misappropriation of any name or likeness for commercial advantage;

4.      false arrest, detention or imprisonment;

5.      invasion of or interference with any right to private occupancy, including trespass, wrongful entry or wrongful eviction;

6.      plagiarism, piracy or misappropriation of ideas under implied contract;

7.      infringement of copyright;

8.      infringement of trade dress, domain name, title or slogan, or the dilution or infringement of trademark or service mark;

9.      negligence regarding the content of any **Media Communication**, including harm caused through any reliance or failure to rely upon such content;

10.     misappropriation of trade secret; or

11.     unfair competition, but only if alleged in conjunction with any of the acts listed in paragraphs 7. or 8. above.

provided, Insuring Agreements A., B., C., D., E. and F. of this Insurance shall not apply to any **Claim** for or arising out of the disclosure, misuse or misappropriation of any ideas, trade secrets or confidential information that came into the possession of any person prior to the date he or she

Complaint, Exhibit A

became an employee, officer, director, **Manager**, principal or partner of the **Insured Organization**.

## II.   DEFENSE AND SETTLEMENT OF CLAIMS

A.   The Underwriters shall have the right and duty to defend, subject to all the provisions, terms and conditions of this Policy:

1.   any **Claim** against the **Insured** seeking **Damages** which are payable under the terms of this Policy, even if any of the allegations of the **Claim** are groundless, false or fraudulent;

2.   any **Claim** in the form of a civil suit against the **Insured** that seeks injunctive relief (meaning a temporary restraining order or a preliminary or permanent injunction) for one or more of the acts listed in Insuring Agreement F. if:

   (a)   the **Claim** is first made and reported to the Underwriters during the **Policy Period** or **Optional Extension Period** (if applicable); and

   (b)   the act or acts were committed on or after the **Retroactive Date** and before the end of the **Policy Period** in the course of the **Insured's** performance of **Professional Services**, **Media Activities** or **Technology Based Services**.

3.   under Insuring Agreement E., any **Claim** in the form of a **Regulatory Proceeding**.

Defense counsel shall be mutually agreed upon between the **Named Insured** and the Underwriters but, in the absence of such agreement, the Underwriters' decision shall be final.

B.   With respect to any **Claim** against the **Insured** seeking **Damages** or **Penalties** which are payable under the terms of this Policy, the Underwriters will pay **Claims Expenses** incurred with their prior written consent.  The Limit of Liability available to pay **Damages**, **Penalties**, or **Privacy Notification Costs** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Damages**, **Penalties**, and **Claims Expenses** shall be applied against the **Retention** payable by the **Insured**.

C.   If the **Insured** shall refuse to consent to any settlement or compromise recommended by the Underwriters and acceptable to the claimant and elects to contest the **Claim**, the Underwriters' liability for any **Damages**, **Penalties** and **Claims Expenses** shall not exceed:

1.   the amount for which the **Claim** could have been settled, less the remaining **Retention**, plus the **Claims Expenses** incurred up to the time of such refusal; plus

2.  fifty percent (50%) of any **Claims Expenses** incurred after the date such settlement or compromise was recommended to the **Insured** plus fifty percent (50%) of any **Damages** above the amount for which the **Claim** could have been settled. The remaining fifty percent (50%) of such **Claims Expenses** and **Damages** must be borne by the **Insured** at their own risk and uninsured;

or the applicable Limit of Liability, whichever is less, and the Underwriters shall have the right to withdraw from the further defense thereof by tendering control of said defense to the **Insured**. The portion of any proposed settlement or compromise that requires the **Insured** to cease, limit or refrain from actual or alleged infringing or otherwise injurious activity or is attributable to future royalties or other amounts that are not **Damages** (or **Penalties** for **Claims** covered under Insuring Agreement E.) shall not be considered in determining the amount for which a **Claim** could have been settled.

D.  The Underwriters agree that the **Insured** may settle any **Claim** where the **Damages** and **Claims Expenses** do not exceed fifty percent (50%) of the **Retention**, provided that the entire **Claim** is resolved and the **Insured** obtains a full release on behalf of all the **Insureds** from all claimants.

## III.   THE INSURED AND THE INSURED ORGANIZATION

As used throughout this Policy, whether expressed in singular or plural, "**Insured**" shall mean:

A.  The **Named Insured** and any **Subsidiaries** of the **Named Insured** (together the "**Insured Organization**");

B.  A director, officer or **Manager** of the **Insured Organization**, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

C.  An employee (including a part time, temporary, leased or seasonal employee) of the **Insured Organization**, but only for work done while acting within the scope of his or her employment and related to the conduct of the **Insured Organization's** business;

D.  A principal if the **Named Insured** is a sole proprietorship, or a partner if the **Named Insured** is a partnership, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

E.  Any person who previously qualified as an **Insured** under III.B., III.C. or III.D. above prior to the termination of the required relationship with the **Insured Organization**, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

F.  The estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death,

Complaint, Exhibit A

incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Insurance; and

G.    The lawful spouse, including any natural person qualifying as a domestic partner under the provisions of any applicable federal, state, or local law in the United States, of any **Insured**, but solely by reason of any act, error or omission of an **Insured** other than such spouse or domestic partner.

## IV.    TERRITORY

This Insurance applies to **Claims** made and acts, errors or omissions committed, or **Loss** occurring anywhere in the world.

## V.    EXCLUSIONS

The coverage under this Insurance does not apply to any **Claim** or **Loss**:

A.    Arising out of or resulting from any criminal, dishonest, fraudulent, or malicious act, error or omission, any intentional **Security Breach**, intentional violation of a **Privacy Policy**, or intentional or knowing violation of the law, if committed by any **Insured**, or by others if such **Insured** colluded or participated in any such conduct or activity; provided, this Policy shall apply to **Claims Expenses** incurred in defending any such **Claim** alleging the foregoing until such time as there is a final adjudication, judgment, binding arbitration decision or conviction against the **Insured**, or written admission by the **Insured**, establishing such conduct, or a plea of *nolo contendere* or no contest regarding such conduct, at which time the Named Insured shall reimburse the Underwriters for all **Claims Expenses** incurred defending the **Claim** and the Underwriters shall have no further liability for **Claims Expenses**;

provided further, that whenever coverage under this Insurance would be excluded, suspended or lost because of this exclusion relating to acts or violations by any **Insured**, and with respect to which any other **Insured** did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge thereof, then the Underwriters agree that such insurance as would otherwise be afforded under this Policy shall cover and be paid with respect to those **Insureds** who did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge of one or more of the acts, errors or omissions described in the immediately preceding paragraph; however this exception to exclusion A. is inapplicable to any **Claim** arising from acts, errors or omissions known to any present or former member of the **Control Group**;

B.    For, arising out of or resulting from any act, error, omission, incident, failure of **Computer Security**, or **Security Breach** committed or occurring prior to the inception date of this Policy:

    1.    if any principal, partner, corporate officer, director or **Manager**, the general counsel or any staff attorney, the chief security officer,

Complaint, Exhibit A

chief information officer, chief privacy officer or the risk manager (or any person in a substantially similar position as those referenced above, or with substantially similar responsibilities as those referenced above, irrespective of the exact title of such individual, and any individual who previously held any of the above referenced positions) of the **Insured Organization** on or before the **Continuity Date** knew or could have reasonably foreseen that such act, error, omission, or incident, failure of **Computer Security**, or **Security Breach** might be expected to be the basis of a **Claim** or **Loss**; or

2. in respect of which any **Insured** has given notice of a circumstance, which might lead to a **Claim** or **Loss**, to the insurer of any other policy in force prior to the inception date of this Policy;

C. For, arising out of or resulting from any related or continuing acts, errors, omissions, incidents or events where the first such act, error, omission, incident or event was committed or occurred prior to the **Retroactive Date** set forth in Item 6.A. of the Declarations;

D. For or arising out of or resulting from **Bodily Injury** or **Property Damage**;

E. For, arising out of or resulting from any contractual liability or obligation, or arising out of or resulting from breach of contract or agreement either oral or written; provided, however, that this exclusion will not apply:

1. with respect to (a) Insuring Agreement A., for breach of an agreement by the **Insured Organization** to perform **Professional Services** or **Technology Based Services**; or (b) Insuring Agreement B., for breach of an agreement by the **Insured Organization** to manufacture, develop, create, distribute, license, lease or sell **Technology Products**; provided, this exception shall not apply to liability assumed in any hold harmless or indemnity agreement, other than a hold harmless or indemnity agreement with respect to intellectual property rights or breaches of the confidentiality of information of any third party;

2. with respect to Insuring Agreement C.1., to any obligation to maintain the confidentiality or security of **Personally Identifiable Non-Public Information** or of **Third Party Corporate Information**;

3. with respect to Insuring Agreement F., for liability:

(a) **Assumed under Contract**; or

(b) misappropriation of ideas under an implied contract; or

4. to the extent the **Insured** would have been liable in the absence of such contract or agreement;

F. For or arising out of or resulting from:

Complaint, Exhibit A

    1.      breach of any express warranty or representation except for an agreement to perform within a reasonable standard of care or skill consistent with applicable industry standards, or breach of any other contractual obligation which goes beyond an express or implied duty to exercise a degree of care or skill as is consistent with applicable industry standards;

    2.      breach of guarantee or any promises of cost savings, profits, or return on investment; or

    3.      delay in delivery or performance, or failure to deliver or perform at or within an agreed upon period of time, but this exclusion shall not apply if such delay or failure to deliver or perform is a consequence of a negligent act, error or omission committed during the course of providing **Professional Services** or **Technology Based Services** if the **Insured** has made diligent efforts to deliver or perform such **Professional Services** or **Technology Based Services**;

G.    For, arising out of or resulting from:

    1.      inaccurate, inadequate, or incomplete description of the price of goods, products or services;

    2.      cost guarantees, cost representations, or contract price estimates of probable costs or cost estimates actually or allegedly being exceeded;

    3.      the failure of goods, products, or services to conform with any represented quality or performance contained in **Advertising**; or

    4.      any actual or alleged gambling, contest, lottery, promotional game or other game of chance;

H.    Arising out of or resulting from any actual or alleged obligation to make licensing fee or royalty payments, including but not limited to the amount or timeliness of such payments;

I.    For, arising out of or resulting from any costs or expenses incurred or to be incurred by the **Insured** or others for:

    1.      the reprinting, recall, removal or disposal of any **Media Material**, including any media or products containing such **Media Material**; or

    2.      the withdrawal, recall, inspection, repair, replacement, reproduction, removal or disposal of:

        (a)    **Technology Products**, including any products or other property of others that incorporate **Technology Products**;

Complaint, Exhibit A

(b) work product resulting from or incorporating the results of **Professional Services** or **Technology Based Services**; or

(c) any products or other property on which **Professional Services** or **Technology Based Services** are performed;

however, this exclusion shall not apply to third party **Claims** for the resulting loss of use of such **Media Material** or **Technology Products**, or loss of use of the work product resulting from such **Professional Services** or **Technology Based Services**;

J.   For, arising out of, resulting from:

1. any failure or malfunction of electrical or telecommunications infrastructure or services, unless under the **Insured Organization's** operational control; or

2. fire, flood, earthquake, volcanic eruption, explosion, lighting, wind, hail, tidal wave, landslide, act of God or other physical event;

K.   For, arising out of or resulting from any actual or alleged antitrust violation, restraint of trade, unfair competition (except as provided in Insuring Agreement F.11), false or deceptive or misleading advertising or violation of the Sherman Antitrust Act, the Clayton Act, or the Robinson-Patman Act, as amended;

L.   For, arising out of or resulting from any actual or alleged false, deceptive or unfair trade practices, or violation of consumer protection laws; however this exclusion does not apply to any **Claim** covered under Insuring Agreements C.1., C.2., C.3. or E. that results from a theft, loss or **Unauthorized Disclosure of Personally Identifiable Non-Public Information** provided that no member of the **Control Group** participated or is alleged to have participated or colluded in such theft, loss or **Unauthorized Disclosure**;

M.   For, in connection with or resulting from a **Claim** brought by or on behalf of the Federal Trade Commission, the Federal Communications Commission, or any other state, federal, local or foreign governmental entity, in such entity's regulatory or official capacity; provided, this exclusion shall not apply to an otherwise covered **Claim** under Insuring Agreement E.;

N.   For, arising out of or resulting from any actual or alleged:

1. infringement of patent or patent rights or misuse of patent;

2. misappropriation of trade secret arising out of or related to **Technology Products** or any other goods or products;

3. under Insuring Agreement C., use or misappropriation of any ideas, trade secrets or **Third Party Corporate Information** (i) by, or on behalf of, the **Insured Organization**, or (ii) by any other

person or entity if such use or misappropriation is done with the knowledge, consent or acquiescence of a member of the **Control Group**; or

    4.    under Insuring Agreement C.2., theft of or **Unauthorized Disclosure** of a **Data Asset**;

O.    For, arising out of or resulting from any of the following:

    1.    any actual or alleged violation of the Organized Crime Control Act of 1970 (commonly known as Racketeer Influenced and Corrupt Organizations Act or RICO), as amended, or any regulation promulgated thereunder or any similar federal law or legislation, or law or legislation of any state, province or other jurisdiction similar to the foregoing, whether such law is statutory, regulatory or common law;

    2.    any actual or alleged violation of any securities law, regulation or legislation, including but not limited to the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Act of 1940, the Sarbanes-Oxley Act of 2002, any state or provincial blue sky or securities law, any other federal securities law or legislation, or any other similar law or legislation of any state, province or other jurisdiction, or any amendment to the above laws, or any violation of any order, ruling or regulation issued pursuant to the above laws; or

    3.    any actual or alleged acts, errors or omissions related to any of the **Insured Organization's** pension, healthcare, welfare, profit sharing, mutual or investment plans, funds or trusts, including any violation of any provision of the Employee Retirement Income Security Act of 1974 (ERISA) or any similar federal law or legislation, or similar law or legislation of any state, province or other jurisdiction, or any amendment to ERISA or any violation of any regulation, ruling or order issued pursuant to ERISA or such similar laws or legislation;

however, this exclusion does not apply to any otherwise covered **Claim** under Insuring Agreements C.1., C.2., or C.3., or to paying **Privacy Notification Costs** under Insuring Agreement D., that results from a theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information**, provided that no member of the **Control Group** participated or colluded in, or is alleged to have participated or colluded in such theft, loss or **Unauthorized Disclosure**;

P.    For, arising out of or resulting from a **Claim** by or on behalf of one or more **Insureds** under this Insurance against any other **Insured** or **Insureds** under this Insurance; provided, this exclusion shall not apply to an otherwise covered **Claim** under Insuring Agreements C.1., C.2., or C.3. made by a current or former employee of the **Insured Organization**;

Complaint, Exhibit A

Q.   For, arising out of or resulting from any **Claim** made by any business enterprise in which any **Insured** has greater than a fifteen percent (15%) ownership interest or made by any parent company or other entity which owns more than fifteen percent (15%) of the **Named Insured**; or any **Insured's** activities as a trustee, partner, member, **Manager**, officer, director or employee of any employee trust, charitable organization, corporation, company or business other than that of the **Insured Organization**;

R.   Arising out of **Professional Services**, **Media Activities** or **Technology Based Services** performed for any entity, or **Technology Products** provided to any entity which is operated, managed or controlled by an **Insured** or in which any **Insured** has an ownership interest in excess of fifteen percent (15%); or in which any **Insured** is an officer or director;

S.   For, arising out of or resulting from:

1.   any employer-employee relations, policies, practices, acts or omissions, or any actual or alleged refusal to employ any person, or misconduct with respect to employees, whether such **Claim** is brought by an employee, former employee, applicant for employment, or relative or domestic partner of such person; provided, however, that this exclusion shall not apply to an otherwise covered **Claim** under Insuring Agreements C.1., C.2. or C.3. by a current or former employee of the **Insured Organization**, or **Privacy Notification Costs** involving current or former employees of the **Insured Organization**;

2.   any actual or alleged violation of the Fair Labor Standards Act of 1938, the National Labor Relations Act, the Worker Adjustment and Retraining Act of 1988, the Certified Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act of 1970, any similar law or legislation of any state, province or other jurisdiction, or any amendment to the above law or legislation, or any violation of any order, ruling or regulation issued pursuant to the above laws or legislation;

3.   any actual or alleged discrimination of any kind including but not limited to age, color, race, sex, creed, national origin, marital status, sexual preference, disability or pregnancy;

T.   For, arising out of or resulting from any actual or alleged (a) unlawful distribution of email, direct mail, text messages or facsimiles, (b) unlawful telemarketing, or (c) eavesdropping, wiretapping or audio or video recording, if any of the above is done by or on behalf of the **Insured Organization**;

U.   For, arising out of or resulting from any actual or alleged act, error or omission or breach of duty by any director, officer or **Manager** in the discharge of their duty if the **Claim** is brought by the **Named Insured**, a **Subsidiary**, or any principals, directors, officers, **Managers**,

Complaint, Exhibit A

stockholders, members or employees of the **Named Insured** or a **Subsidiary** in his or her capacity as such;

V.    Brought by or on behalf of:

1.    any intellectual property licensing bodies or organizations, including but not limited to, the American Society of Composers, Authors and Publishers, the Society of European Stage Authors and Composers or Broadcast Music, Inc.; or

2.    under Insuring Agreement F., any independent contractor, then current joint venturer or then current venture partner and arising out of or resulting from disputes over ownership of rights in **Media Material** or services provided by such independent contractor, then current joint venturer or then current venture partner;

W.    For, arising out of or resulting from any of the following: (1) trading losses, trading liabilities or change in value of accounts; any loss, transfer or theft of monies, securities or tangible property of others in the care, custody or control of the **Insured Organization**; (2) the monetary value of any transactions or electronic fund transfers by or on behalf of the **Insured** which is lost, diminished, or damaged during transfer from, into or between accounts; or (3) the value of coupons, price discounts, prizes, awards, or any other valuable consideration given in excess of the total contracted or expected amount;

X.    Under Insuring Agreement E., (a) costs to remediate or improve the **Insured Organization's Computer Systems**, (b) costs to establish, implement, maintain, improve or remediate security or privacy practices, procedures, programs or policies, (c) audit, assessment, compliance or reporting costs, or (d) costs to protect the confidentiality, integrity and/or security of **Personally Identifiable Non-Public Information** from theft, loss or disclosure, even if it is in response to a regulatory proceeding or investigation; or

Y.    Either in whole or in part, directly or indirectly, arising out of or resulting from or in consequence of, or in any way involving:

1.    asbestos, or any materials containing asbestos in whatever form or quantity;

2.    the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind; any action taken by any party in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins; and any governmental or regulatory order, requirement, directive, mandate or decree that any party take action in response to the actual,

Complaint, Exhibit A

potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins;

The Underwriters will have no duty or obligation to defend any **Insured** with respect to any **Claim** or governmental or regulatory order, requirement, directive, mandate or decree which either in whole or in part, directly or indirectly, arises out of or results from or in consequence of, or in any way involves the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind;

3.  the existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment, or that affects the value, marketability, condition or use of any property; or

4.  the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants; or any governmental, judicial or regulatory directive or request that the **Insured** or anyone acting under the direction or control of the **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants. Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant including gas, acids, alkalis, chemicals, heat, smoke, vapor, soot, fumes or waste. Waste includes but is not limited to materials to be recycled, reconditioned or reclaimed.

## VI.   DEFINITIONS

Wherever used in this Policy in bold face type, the following definitions shall apply.

A.  **Advertising** means material which promotes the product, service or business of the **Insured Organization** or others.

B.  **Application** means all applications, including any attachments thereto, and all other information and materials submitted or specifically referenced by or on behalf of the **Insured** to the Underwriters in connection with the underwriting of this Policy, or prior policies of which this Policy is a renewal thereof.

C.  **Assumed Under Contract** means liability assumed by the **Insured Organization** under a written hold harmless or indemnity agreement regarding the content of **Media Material** used in a **Media Communication**, but only as respects acts for which insurance is afforded under Insuring Agreement F.

Complaint, Exhibit A

D.    **Bodily Injury** means physical injury, sickness, disease or death of any person, including any mental anguish or emotional distress resulting therefrom.

E.    **Breach Notice Law** means any statute or regulation that requires notice to persons whose **Personally Identifiable Non-Public Information** was accessed or reasonably may have been accessed by an unauthorized person.

F.    **Claim** means:

1.    a written demand received by any **Insured** for money or services, including the service of a suit or institution of arbitration proceedings;

2.    a threat or initiation of a suit seeking injunctive relief (meaning a temporary restraining order or a preliminary or permanent injunction).

3.    with respect to coverage provided under Insuring Agreement E. only, institution of a **Regulatory Proceeding** against any **Insured**; and

4.    a written request or agreement to toll or waive a statute of limitations relating to a potential **Claim** described above.

Multiple **Claims** arising from the same or a series of related or repeated acts, errors or omissions, or from any continuing acts, errors or omissions, or from multiple **Security Breaches** arising from a failure of **Computer Security**, shall be considered a single **Claim** for the purposes of this Policy, irrespective of the number of claimants or **Insureds** involved in the **Claim**. All such **Claims** shall be deemed to have been made at the time of the first such **Claim**.

G.    **Claims Expenses** means:

1.    reasonable and necessary fees charged by an attorney designated pursuant to Clause II., Defense and Settlement of Claims, paragraph A.;

2.    all other legal costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, suit or proceeding arising in connection therewith, or circumstance which might lead to a **Claim**, if incurred by the Underwriters, or by the **Insured** with the prior written consent of the Underwriters; and

3.    the premium cost for appeal bonds for covered judgments or bonds to release property used to secure a legal obligation, if required in any **Claim** against an **Insured**; provided the Underwriters shall have no obligation to appeal or to obtain bonds.

F00226
052011 ed.

Complaint, Exhibit A

Filed in District Court
State of Minnesota
3/1/2021 2:12 PM

**Claims Expenses** do not include any salary, overhead or other amounts charged or incurred by the **Insured** in assisting the Underwriters or cooperating in the defense and investigation of any **Claim** or circumstance that might lead to a **Claim** notified under this Policy or costs to comply with any regulatory orders, settlements or judgments.

H.  **Computer Security** means software, computer or network hardware devices, as well as the **Insured Organization's** written information security policies and procedures, the function or purpose of which is to prevent **Unauthorized Access or Use**, a **Denial of Service Attack** against **Computer Systems**, infection of **Computer Systems** by **Malicious Code** or transmission of **Malicious Code** from **Computer Systems**. **Computer Security** includes anti-virus and intrusion detection software, firewalls and electronic systems that provide access control to **Computer Systems** through the use of passwords, biometric or similar identification of authorized users.

I.  **Computer Systems** means computers and associated input and output devices, data storage devices, networking equipment, and back up facilities:

1.  operated by and either owned by or leased to the **Insured Organization**; or

2.  systems operated by a third party service provider and used for the purpose of providing hosted computer application services to the **Insured Organization** or for processing, maintaining, hosting or storing the **Insured Organization's** electronic data, pursuant to written contract with the **Insured Organization** for such services.

J.  **Continuity Date** means (i) the date stated in Item 6.B. of the Declarations with respect to the **Named Insured** and any **Subsidiaries** acquired before the date stated in Item 6.B. of the Declarations; or (ii) with respect to any **Subsidiaries** acquired after the date stated in Item 6.B. of the Declarations, the date the **Named Insured** acquired such **Subsidiary**.

K.  **Control Group** means the individuals holding the following positions in the **Insured Organization**: President; members of the Board of Directors; executive officers, including the Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer; General Counsel, staff attorneys employed by the **Insured Organization**; Chief Information Officer; Chief Security Officer; Chief Privacy Officer; **Manager**; and any individual in a substantially similar position as those referenced above, or with substantially similar responsibilities as those referenced above, irrespective of the exact title of such individual, and any individual who previously held any of the above referenced positions.

L.  **Damages** means a monetary judgment, award or settlement, provided that the term **Damages** shall not include or mean:

1.  future profits, restitution, disgorgement of unjust enrichment or profits by an **Insured**, or the costs of complying with orders granting injunctive or equitable relief;

2.  return or offset of fees, charges, or commissions for goods or services already provided or contracted to be provided;

3.  costs incurred by the **Insured** to correct, re-perform or complete any **Professional Services, Media Activities** or **Technology Based Services**;

4.  taxes or loss of tax benefits;

5.  fines, sanctions, penalties or any damages which are a multiple of compensatory damages;

6.  punitive or exemplary damages, unless insurable by law in any applicable venue that most favors coverage for such punitive or exemplary damages;

7.  discounts, coupons, prizes, awards or other incentives offered to the **Insured's** customers or clients;

8.  liquidated damages to the extent that such damages exceed the amount for which the **Insured** would have been liable in the absence of such liquidated damages agreement; or

9.  any amounts for which the **Insured** is not liable, or for which there is no legal recourse against the **Insured**.

M.  **Data Asset** means any software or electronic data that exists in **Computer Systems** and that is subject to regular back up procedures, including computer programs, applications, account information, customer information, private or personal information, marketing information, financial information and any other information maintained by the **Insured Organization** in its ordinary course of business.

N.  **Denial of Service Attack** means an attack intended by the perpetrator to overwhelm the capacity of a **Computer System** by sending an excessive volume of electronic data to such **Computer System** in order to prevent authorized access to such **Computer System**.

O.  **Loss** means **Damages**, **Claims Expenses**, **Privacy Notification Costs** and **Penalties**.

P.  **Malicious Code** means any virus, Trojan horse, worm or any other similar software program, code or script intentionally designed to insert itself into computer memory or onto a computer disk and spread itself from one computer to another.

Q.  **Management Control** means:

Complaint, Exhibit A

1.     owning, directly or indirectly, more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of an entity's directors (in the case of a corporation), members of the board of managers (in the case of a limited liability company), management committee members (in the case of a joint venture or partnership) or persons serving in a functionally equivalent role for such an entity operating or organized outside of the United States; or

2.     having the right, pursuant to a written contract or the bylaws, charter, operating agreement or similar documents of an entity to elect, appoint or designate a majority of: the board of directors of a corporation; the management committee of a joint venture or partnership; the management board of a limited liability company; or persons serving in a functionally equivalent role for such an entity operating or organized outside of the United States.

R.     **Manager** means a manager of a limited liability company.

S.     **Media Activities** means **Media Communications** and/or the gathering, collection or recording of **Media Material** for inclusion in any **Media Communication** in the ordinary course of the **Insured Organization's** business.

T.     **Media Communication** means the display, broadcast, dissemination, distribution or release of **Media Material** to the public by the **Insured Organization**.

U.     **Media Material** means words, sounds, numbers, images, or graphics or other information in electronic, print or broadcast form, including **Advertising**, but does not mean computer software or the actual goods, products or services described, illustrated or displayed in such **Media Material**.

V.     **Named Insured** means the individual, partnership, entity or corporation designated as such in Item 1. of the Declarations.

W.     **Optional Extension Period** means the period of time after the end of the **Policy Period** for reporting **Claims** as provided in Clause X., Optional Extension Period, of this Policy.

X.     **Penalties** means:

1.     any civil fine or money penalty payable to a governmental entity that was imposed in a **Regulatory Proceeding** by the Federal Trade Commission, Federal Communications Commission, or any other federal, state, local or foreign governmental entity, in such entity's regulatory or official capacity; the insurability of **Penalties** shall be in accordance with the law in the applicable venue that most favors coverage for such **Penalties**; and

Complaint, Exhibit A

2.    amounts which the Insured is legally obligated to deposit in a fund as equitable relief for the payment of consumer claims due to an adverse judgment or settlement of a **Regulatory Proceeding** (including such amounts required to be paid into a "Consumer Redress Fund"); but shall not include payments to charitable organizations or disposition of such funds other than for payment of consumer claims for losses caused by an event covered by Insuring Agreements C.1., C.2. or C.3.

Y.    **Personally Identifiable Non-Public Information** means:

1.    information concerning the individual that constitutes "nonpublic personal information" as defined in the Gramm-Leach Bliley Act of 1999, as amended, and regulations issued pursuant to the Act;

2.    medical or heath care information concerning the individual, including "protected health information" as defined in the Health Insurance Portability and Accountability Act of 1996, as amended, and regulations issued pursuant to the Act;

3.    information concerning the individual that is defined as private personal information under statutes enacted to protect such information in foreign countries, for **Claims** subject to the law of such jurisdiction;

4.    information concerning the individual that is defined as private personal information under a **Breach Notice Law**; or

5.    the individual's drivers license or state identification number; social security number; unpublished telephone number; and credit, debit or other financial account numbers in combination with associated security codes, access codes, passwords or PINs;

if such information allows an individual to be uniquely and reliably identified or contacted or allows access to the individual's financial account or medical record information but does not include publicly available information that is lawfully made available to the general public from government records.

Z.    **Policy Aggregate Limit of Liability** means the aggregate Limit of Liability set forth in Item 3.A. of the Declarations.

AA.    **Policy Period** means the period of time between the inception date shown in the Declarations and the effective date of termination, expiration or cancellation of this Insurance and specifically excludes any **Optional Extension Period** or any prior policy period or renewal period.

BB.    **Privacy Law** means a federal, state or foreign statute or regulation requiring the **Insured Organization** to protect the confidentiality and/or security of **Personally Identifiable Non-Public Information**.

CC.    **Privacy Policy** means the **Insured Organization's** publicly available written statement of its policy for collection, use, disclosure, sharing,

Complaint, Exhibit A

dissemination and correction or supplementation of, and access to **Personally Identifiable Non-Public Information**.

DD.   **Professional Services** means professional services performed for others by or on behalf of the **Insured Organization** for a fee, but does not include **Technology Based Services**, **Media Activities**, any services involving the creation, development, sale, distribution, installation, licensing or manufacturing of **Technology Products**, or work or activities performed by or on behalf of the **Insured Organization** or for the **Insured Organization** as an accountant, architect, surveyor, health care provider, lawyer, insurance or real estate agent or broker, or civil or structural engineer.

EE.   **Property Damage** means physical injury to or destruction of any tangible property, including the loss of use thereof.  For the purpose of this definition, tangible property shall not include electronic data.

FF.   **Regulatory Proceeding** means a request for information, civil investigative demand, or civil proceeding commenced by service of a complaint or similar proceeding brought by or on behalf of the Federal Trade Commission, Federal Communications Commission, or any federal, state, local or foreign governmental entity in such entity's regulatory or official capacity in connection with such proceeding.

GG.   **Retention** means the applicable retention for each Insuring Agreement as specified in Item 4. of the Declarations.

HH.   **Retroactive Date** means the date specified in Item 6.A. of the Declarations.

II.   **Security Breach** means:

1.   **Unauthorized Access or Use** of **Computer Systems**, including **Unauthorized Access or Use** resulting from the theft of a password from a **Computer System** or from any **Insured**;

2.   a **Denial of Service Attack** against **Computer Systems** or **Third Party Computer Systems**; or

3.   infection of **Computer Systems** by **Malicious Code** or transmission of **Malicious Code** from **Computer Systems**,

regardless of whether any of the foregoing is a specifically targeted or generally distributed attack.

A series of continuing **Security Breaches**, related or repeated **Security Breaches**, or multiple **Security Breaches** resulting from a continuing failure of **Computer Security** shall be considered a single **Security Breach** and be deemed to have occurred at the time of the first such **Security Breach**.

Complaint, Exhibit A

JJ.  **Subsidiary** means any corporation, limited liability company, joint venture or partnership while the **Named Insured** has **Management Control** over such entity, if the **Named Insured**:

1.  had **Management Control** over such entity on the inception date of this Policy or such entity was an insured under a policy issued by the Underwriters of which this Policy is a renewal;

2.  acquires **Management Control** after the inception date of this Policy, provided the revenues of the entity do not exceed fifteen percent (15%) of the **Named Insured's** annual revenues for the four quarterly periods directly preceding inception of the **Policy Period**; or

3.  acquires **Management Control** after the inception date of this Policy, provided that if the revenues of the entity exceed fifteen percent (15%) of the **Named Insured's** annual revenues for the four quarterly periods directly preceding inception of the **Policy Period**, the provisions of Clause XV., Mergers and Acquisitions, must be fulfilled;

provided, that this Policy only provides coverage for acts, errors, omissions, incidents or events that take place while the **Named Insured** has **Management Control** over such entity.

KK.  **Technology Based Services** means computer and electronic technology services, including data processing, Internet services, data and application hosting, computer systems analysis, technology consulting and training, custom software programming for a specific client of the **Insured Organization**, computer and software systems installation and integration, computer and software support, and network management services performed by the **Insured**, or by others acting under the **Insured Organization's** trade name, for others for a fee, but shall not mean **Technology Products**.

LL.  **Technology Products** means a computer or telecommunications hardware or software product, or related electronic product that is created, manufactured or developed by the **Insured Organization** for others, or distributed, licensed, leased or sold by the **Insured Organization** to others, for compensation, including software updates, service packs and other maintenance releases provided for such products.

MM.  **Third Party Computer Systems** means any computer systems that: (1) are not owned, operated or controlled by an Insured; and (2) does not include computer systems of a third party on which an **Insured** performs services.  Computer systems include associated input and output devices, data storage devices, networking equipment, and back up facilities.

NN.  **Third Party Corporate Information** means any trade secret, data, design, interpretation, forecast, formula, method, practice, credit or debit card magnetic strip information, process, record, report or other item of

Complaint, Exhibit A

information of a third party not insured under this Policy which is not available to the general public and is provided to the **Insured** subject to a fully executed written confidentiality agreement or which the **Insured Organization** is legally required to maintain in confidence; however, **Third Party Corporate Information** shall not include **Personally Identifiable Non-Public Information**.

OO.   **Unauthorized Access or Use** means the gaining of access to or use of **Computer Systems** by an unauthorized person or persons or the use of **Computer Systems** in an unauthorized manner.

PP.   **Unauthorized Disclosure** means the disclosure (including disclosure resulting from phishing) of or access to information in a manner that is not authorized by the **Insured Organization** and is without knowledge of, consent, or acquiescence of any member of the **Control Group**.

## VII.   LIMIT OF LIABILITY

A.   The **Policy Aggregate Limit of Liability** stated in Item 3.A.of the Declarations is the Underwriters' combined total limit of liability for all **Loss** payable under this Policy.

The sublimit of liability stated in Item 3.B. of the Declarations is the aggregate limit of liability payable under this Policy for all **Privacy Notification Costs** covered under Insuring Agreement D.

The sublimit of liability stated in Item 3.C. of the Declarations is the aggregate limit of liability under this Policy for all **Claims Expenses** and **Penalties** covered under Insuring Agreement E.

The above sublimits of liability are part of, and not in addition to, the **Policy Aggregate Limit of Liability** listed in Item 3.A. of the Declarations.

Neither the inclusion of more than one Insured under this Policy, nor the making of **Claims** by more than one person or entity shall increase the Limit of Liability.

B.   The Limit of Liability for the **Optional Extension Period** shall be part of and not in addition to the **Policy Aggregate Limit of Liability**.

C.   The Underwriters shall not be obligated to pay any **Loss**, or to undertake or continue defense of any suit or proceeding, after the **Policy Aggregate Limit of Liability** or any other applicable limit of liability set forth in the Declarations has been exhausted by payment of **Loss**, or after deposit of the **Policy Aggregate Limit of Liability** or any other applicable limit of liability in a court of competent jurisdiction.  Upon such payment, the Underwriters shall have the right to withdraw from the further defense of any **Claim** under this Policy by tendering control of said defense to the **Insured**.

Complaint, Exhibit A

Filed in District Court
State of Minnesota
3/1/2021 2:12 PM

**VIII.   RETENTION**

A.   The **Retention** amount set forth in Item 4.A. of the Declarations applies separately to each incident, event, or related incidents or events, giving rise to a **Claim**. The **Retention** shall be satisfied by monetary payments by the **Named Insured** of **Damages**, **Claims Expenses or Penalties.**

B.   The **Retention** amount set forth in Item 4.B. of the Declarations applies separately to each incident, event or related incidents or events, giving rise to an obligation to pay **Privacy Notification Costs**. The **Retention** shall be satisfied by monetary payments by the **Named Insured** of **Privacy Notification Costs**.

C.   Satisfaction of the applicable **Retention** is a condition precedent to the payment by the Underwriters of any amounts hereunder, and the Underwriters shall be liable only for the amounts in excess of such **Retention** subject to the Underwriters' total liability not exceeding the **Policy Aggregate Limit of Liability** or any applicable Limit of Liability. The **Named Insured** shall make direct payments within the **Retention** to appropriate other parties designated by the Underwriters.

**IX.   NOTICE OF CLAIM, LOSS OR CIRCUMSTANCE THAT MIGHT LEAD TO A CLAIM**

A.   If any **Claim** is made against the **Insured**, the **Insured** shall forward as soon as practicable to the Underwriters through persons named in Item 8.(a) of the Declarations written notice of such **Claim** in the form of a telecopy, email, or express or certified mail together with every demand, notice, summons or other process received by the **Insured** or the **Insured's** representative. In no event shall such notice to the Underwriters be later than the end of the **Policy Period**, the end of the **Optional Extension Period** (if applicable), or sixty (60) days after the expiration date of the **Policy Period** in the case of **Claims** first made against the **Insured** during the last sixty (60) days of the **Policy Period**.

B.   With respect to Insuring Agreement D. for a legal obligation to comply with a **Breach Notice Law** because of an incident (or reasonably suspected incident) described in Insuring Agreement C.1., C.2. or C.3., such incident or reasonably suspected incident must be reported in writing to the Underwriters through the persons named in Item 8.(a) of the Declarations in the form of a telecopy, email or express or certified mail, including specific details of the incident, as soon as practicable during the **Policy Period** after discovery by the **Insured**; provided, however, that unless the **Insured** cancels the Policy, or the Underwriters cancel for non-payment of premium, incidents discovered by the **Insured** within sixty (60) days prior to expiration of the Policy shall be reported as soon as practicable, but in no event later than sixty (60) days after the end the **Policy Period**; provided further, that if this Policy is renewed by the Underwriters and covered **Privacy Notification Costs** are incurred because of such incident or suspected incident that was discovered by the **Insured** within sixty (60) days prior to the expiration of the Policy, and

first reported during the sixty (60) day post **Policy Period** reporting period, then any subsequent **Claim** arising out of such incident or suspected incident is deemed to have been made during the **Policy Period**.

C.   If during the **Policy Period** the **Insured** first becomes aware of any circumstance that could reasonably be the basis for a **Claim** it may give written notice to the Underwriters in the form of a telecopy, email or express or certified mail through persons named in Item 8.(a) of the Declarations as soon as practicable during the **Policy Period**. Such notice must include:

1.   the specific details of the act, error or omission in the provision of **Professional Services**, **Media Activities** or **Technology Based Services** or relating to **Technology Products** or a **Security Breach** that could reasonably be the basis for a **Claim**;

2.   the injury or damage which may result or has resulted from the circumstance; and

3.   the facts by which the **Insured** first became aware of the act, error, or omission or **Security Breach**.

Any subsequent **Claim** made against the **Insured** arising out of such circumstance which is the subject of the written notice will be deemed to have been made at the time written notice complying with the above requirements was first given to the Underwriters.

D.   A **Claim** or legal obligation under paragraph A. or B. above shall be considered to be reported to the Underwriters when written notice is first received by the Underwriters in the form of a telecopy, email or express or certified mail or email through persons named in Item 8.(a) of the Declarations of the **Claim** or legal obligation, or of an act, error, or omission, which could reasonably be expected to give rise to a **Claim** if provided in compliance with paragraph C. above.

## X.   OPTIONAL EXTENSION PERIOD

A.   In the event of the termination of this Insurance for any reason except the non-payment of premium, the **Named Insured** designated in Item 1. of the Declarations shall have the right, upon payment in full and not proportionally or otherwise in part of the percentage shown in Item 7.A. of the Declarations of the full Premium set forth below,  to have issued an endorsement providing an **Optional Extension Period** for the period of time set forth in Item 7.B. of the Declarations for **Claims** first made against any **Insured** and reported to the Underwriters during the **Optional Extension Period**, and arising out of any act, error or omission committed on or after the **Retroactive Date** and before the end of the **Policy Period**, subject to the conditions set forth herein.  In order for the **Named Insured** to invoke the **Optional Extension Period** option, the payment of the additional premium for the **Optional Extension Period**

Complaint, Exhibit A

must be paid to the Underwriters within thirty (30) days of the termination of this Insurance. If notice of election of the **Optional Extension Period** and full premium payment is not given to the Underwriters within such thirty (30) day period, there shall be no right to purchase the **Optional Extension Period**.

B.    The Limit of Liability for the **Optional Extension Period** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** and the exercise of the **Optional Extension Period** shall not in any way increase the **Policy Aggregate Limit of Liability** or any sublimit of liability.  The **Optional Extension Period** does not apply to Insuring Agreement D.

C.    The right to the **Optional Extension Period** shall not be available to the **Named Insured** where the Policy premium has not been paid in full, or where cancellation or non-renewal by the Underwriters is due to non-payment of premium or failure of an **Insured** to pay such amounts in excess of the applicable limit of liability or within the amount of the applicable **Retention**.

D.    All notices and premium payments with respect to the **Optional Extension Period** option shall be directed to the Underwriters through the entity named in Item 8.(b) of the Declarations.

E.    At the commencement of the **Optional Extension Period** the entire premium shall be deemed earned, and in the event the **Named Insured** terminates the **Optional Extension Period** for any reason prior to its natural expiration, the Underwriters will not be liable to return any premium paid for the **Optional Extension Period**.

## XI.    WARRANTY

By acceptance of this Policy, all **Insureds** agree that the statements contained in the **Application** are their agreements and representations, that they shall be deemed material to the risk assumed by Underwriters, and that this Policy is issued in reliance upon the truth thereof.

## XII.    OTHER INSURANCE

The insurance under this Policy shall apply in excess of any other valid and collectible insurance available to any **Insured**, including any self insured retention or deductible portion thereof, unless such other insurance is written only as specific excess insurance over the **Policy Aggregate Limit of Liability** or any other applicable Limit of Liability of this Policy.

## XIII.    ASSIGNMENT

The interest hereunder of any **Insured** is not assignable.  If the **Insured** shall die or be adjudged incompetent, such insurance shall cover the **Insured**'s legal representative as the **Insured** as would be permitted by this Policy.

## XIV.    CANCELLATION

A.    This Policy may be cancelled by the **Named Insured**, by surrender

Complaint, Exhibit A

thereof to the Underwriters or by mailing or delivering to the Underwriters through the entity named in Item 8.(b) of the Declarations, written notice stating when the cancellation shall be effective.

B.   This Policy may be cancelled by the Underwriters by mailing or delivering to the **Named Insured** at the address shown in the Declarations written notice stating when, not less than sixty (60) days thereafter, such cancellation shall be effective.  However, if the Underwriters cancel this Insurance because the **Insured** has failed to pay a premium when due, this Policy may be cancelled by the Underwriters by mailing a written notice of cancellation to the **Named Insured** at the address shown in the Declarations stating when, not less than ten (10) days thereafter, such cancellation shall be effective.  Mailing of notice shall be sufficient proof of notice.   The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the **Policy Period**.  Delivery (where permitted by law) of such written notice either by the **Named Insured** or by the Underwriters shall be equivalent of mailing.

C.   If the **Named Insured** cancels this Policy, the earned premium shall be computed in accordance with the attached short rate table and procedure.

D.   If the Underwriters cancel this Policy prior to any **Claim** being reported or Loss incurred under this Policy, earned premium shall be computed pro rata.

E.   The premium shall be deemed fully earned if any **Claim** under this Policy is reported to the Underwriters or **Loss** incurred under this Policy on or before the date of cancellation.

F.   Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

## XV.   MERGERS AND ACQUISITIONS

A.   **Newly Acquired Subsidiaries**

If during the **Policy Period** the **Named Insured** or any **Subsidiary** acquires any entity whose annual revenues are more than fifteen percent (15%) of the **Named Insured's** total annual revenues for the four quarterly periods directly preceding inception of the **Policy Period**,  then, subject to the **Policy Period** and all other terms and conditions of this Policy, coverage under this Policy shall be afforded for a period of sixty (60) days, but only for any **Claim** that arises out of any act, error or omission first committed or incident or event first occurring after the entity becomes so owned.  Coverage beyond such sixty (60) day period shall only be available if the **Named Insured** gives the Underwriters written notice of the acquisition, obtains the written consent of the Underwriters to extend coverage beyond such sixty (60) day period to the entity and agrees to pay any additional premium required by the Underwriters.

B.   **Mergers or Consolidations**

Complaint, Exhibit A

If during the **Policy Period** the **Named Insured** consolidates or merges with or is acquired by another entity, or sells substantially all of its assets to any other entity, then this Policy shall remain in full force and effect, but only with respect to a **Security Breach**, or other acts or incidents that occur prior to the date of the consolidation, merger or acquisition. No coverage shall be provided by this Policy for any other **Claim** or **Loss** unless the **Named Insured** provides written notice to the Underwriters prior to such consolidation, merger or acquisition, the Named Insured has agreed to any additional premium and terms of coverage required by the Underwriters and the Underwriters have issued an endorsement extending coverage under this Policy.

C. All notices and premium payments made under this Clause XV. shall be directed to the Underwriters through the entity named in Item 8.(b) of the Declarations.

## XVI. ASSISTANCE AND COOPERATION

A. The Underwriters shall have the right to make any investigation they deem necessary, and the **Insured** shall cooperate with the Underwriters in all investigations, including investigations regarding the **Application** for and coverage under this Policy. The **Insured** shall execute or cause to be executed all papers and render all assistance as is requested by the Underwriters. The **Insured** agrees not to take any action which in any way increases the Underwriters' exposure under this Policy.

However, notwithstanding the above, the **Insured's** rights under this Policy shall not be prejudiced by any refusal to disclose the identity of any confidential source of information, or to produce any documentation or information obtained in the course of **Media Activities** in respect of which the **Insured** has asserted a claim of reporter's privilege or any other privilege regarding the protection of news-gathering activities.

B. Upon the Underwriters' request, the **Insured** shall assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **Insured** because of acts, errors or omissions, incidents or events with respect to which insurance is afforded under this Policy; and the **Insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

C. The **Insured** shall not admit liability, make any payment, assume any obligations, incur any expense, enter into any settlement, stipulate to any judgment or award or dispose of any **Claim** without the written consent of the Underwriters, except as specifically provided in Clause II., Defense and Settlement of Claims, paragraph D.

Compliance with a **Breach Notice Law** will not be considered as an admission of liability for purposes of this Clause XVI.C.

Complaint, Exhibit A

Filed in District Court
State of Minnesota
3/1/2021 2:12 PM

D.   Expenses incurred by the **Insured** in assisting and cooperating with the Underwriters do not constitute **Claims Expenses** under the Policy.

## XVII.   ACTION AGAINST THE UNDERWRITERS

No action shall lie against the Underwriters or the Underwriters' representatives unless and until, as a condition precedent thereto, the **Insured** shall have fully complied with all provisions, terms and conditions of this Insurance, and the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment or award against the **Insured** after trial, regulatory proceeding, arbitration or by written agreement of the **Insured**, the claimant and the Underwriters.  No person or organization shall have the right under this Policy to join the Underwriters as a party to an action or other proceeding against the **Insured** to determine the **Insured's** liability, nor shall the Underwriters be impleaded by the **Insured** or the **Insured's** legal representatives.  The **Insured's** bankruptcy or insolvency or of the **Insured's** estate shall not relieve the Underwriters of their obligations hereunder.

## XVIII.   SUBROGATION

If any payment is made under this Policy and there is available to the Underwriters any of the **Insured's** rights of recovery against any other party, then the Underwriters shall maintain all such rights of recovery.  The **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights.  The **Insured** shall do nothing to prejudice such rights without the Underwriters' prior written approval.  Any recoveries shall be applied first to subrogation expenses, second to **Loss** paid by the Underwriters, and lastly to the **Retention**.  Any additional amounts recovered shall be paid to the **Named Insured**.

## XIX.   ENTIRE AGREEMENT

By acceptance of the Policy, all **Insureds** agree that this Policy embodies all agreements between the Underwriters and the **Insured** relating to this Policy. Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Policy or estop the Underwriters from asserting any right under the terms of this Insurance; nor shall the terms of this Insurance be waived or changed, except by endorsement issued to form a part of this Policy signed by the Underwriters.

## XX.   VALUATION AND CURRENCY

All premiums, limits, deductibles, **Damages** and other amounts under this Policy are expressed and payable in the currency of the United States.  If judgment is rendered, settlement is denominated or another element of **Damages** under this Policy is stated in a currency other than United States dollars or if **Claims Expenses** are paid in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date the judgment becomes final or payment of the settlement or other element of **Damages** is due or the date such **Claims Expenses** are paid.

Filed in District Court
State of Minnesota
3/1/2021 2:12 PM

## XXI.    AUTHORIZATION

By acceptance of this Policy and the coverage provided hereunder, the **Insureds** agree and acknowledge that (a) the **Named Insured** will act on their behalf with respect to the giving and receiving of any notice pertaining to this Policy, the payment of premiums and the receipt of any return premiums that may become due under this Policy, and the agreement to and acceptance of endorsements; and (b) the Underwriters shall not bear any liability in connection with the same.

## XXII.    HEADINGS

The titles of paragraphs, sections, provisions or endorsements of or to this Policy are intended solely for convenience and reference, and are not deemed in any way to limit or expand the provisions to which they relate and are not part of the Policy.

## XXIII.    SERVICE OF SUIT CLAUSE (U.S.A.)

A.    It is agreed that in the event of the failure of the Underwriters to pay any amount claimed to be due under this Insurance, the Underwriters herein, at the **Insured's** request, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this clause constitutes or should be understood to constitute a waiver of the Underwriters' rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or seek a transfer of a case to another court as permitted by the laws of the United States or any state in the United States.  It is further agreed that service of process in such suit may be made upon the Underwriters' representative designated in Item 10. of the Declarations, and that in any suit instituted against any one of the Underwriters upon this Policy, the Underwriters will abide by the final decision of such court or of any appellate court in the event of an appeal.

B.    The Underwriters' representative designated in Item 10. of the Declarations is authorized and directed to accept service of process on the Underwriters' behalf in any such suit and/or upon the Insured's request to give a written undertaking to the **Insured** that they will enter a general appearance upon the Underwriters' behalf in the event such a suit shall be instituted.

C.    Pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Underwriters hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on the **Insured's** behalf or any beneficiary hereunder arising out of this Policy, and hereby designate the Underwriters' representative designated in Item 10. of the Declarations as the person to whom said officer is authorized to mail such process or a true copy thereof.

Complaint, Exhibit A

## XXIV.   SINGULAR FORM OF A WORD

Whenever the singular form of a word is used herein, the same shall include the plural when required by context.

## XXV.   CHOICE OF LAW

Unless otherwise set forth in Item 11. of the Declarations, this Policy shall be interpreted in accordance with New York state law, without giving effect to conflicts of laws principles, other than such principles directing application of New York law.

## XXVI.   SHORT RATE CANCELLATION TABLE

Notwithstanding anything to the contrary contained herein and in consideration of the premium for which this Insurance is written it is agreed that in the event of cancellation thereof by the **Insured** the earned premium shall be computed as follows:

A.   For insurance written for one (1) year:

| Days Insurance in Force | Percentage of One Year Premium | Days Insurance in Force | Percentage of One Year Premium |
|---|---|---|---|
| 1-54 | 25 | 192-196 | 63 |
| 55-58 | 26 | 197-200 | 64 |
| 59-62 (2 months) | 27 | 201-205 | 65 |
| 63-65 | 28 | 206-209 | 66 |
| 66-69 | 29 | 210-214 (7 months) | 67 |
| 70-73 | 30 | 215-218 | 68 |
| 74-76 | 31 | 219-223 | 69 |
| 77-80 | 32 | 224-228 | 70 |
| 81-83 | 33 | 229-232 | 71 |
| 84-87 | 34 | 233-237 | 72 |
| 88-91 (3 months) | 35 | 238-241 | 73 |
| 92-94 | 36 | 242-246 (8 months) | 74 |
| 95-98 | 37 | 247-250 | 75 |
| 99-102 | 38 | 251-255 | 76 |
| 103-105 | 39 | 256-260 | 77 |
| 106-109 | 40 | 261-264 | 78 |
| 110-113 | 41 | 265-269 | 79 |
| 114-116 | 42 | 270-273 (9 months) | 80 |
| 117-120 | 43 | 274-278 | 81 |
| 121-124 (4 months) | 44 | 279-282 | 82 |
| 125-127 | 45 | 283-287 | 83 |
| 128-131 | 46 | 288-291 | 84 |
| 132-135 | 47 | 292-296 | 85 |
| 136-138 | 48 | 297-301 | 86 |
| 139-142 | 49 | 302-305 (10 months) | 87 |
| 143-146 | 50 | 306-310 | 88 |

F00226
052011 ed.

Complaint, Exhibit A

Filed in District Court
State of Minnesota
3/1/2021 2:12 PM

| | | | |
|---|---|---|---|
| 147-149 | 51 | 311-314 | 89 |
| 150-153 (5 months) | 52 | 315-319 | 90 |
| 154-156 | 53 | 320-323 | 91 |
| 157-160 | 54 | 324-328 | 92 |
| 161-164 | 55 | 329-332 | 93 |
| 165-167 | 56 | 333-337 (11 months) | 94 |
| 168-171 | 57 | 338-342 | 95 |
| 172-175 | 58 | 343-346 | 96 |
| 176-178 | 59 | 347-351 | 97 |
| 179-182 (6 months) | 60 | 352-355 | 98 |
| 183-187 | 61 | 356-360 | 99 |
| 188-191 | 62 | 361-365 (12 months) | 100 |

B.   For insurance written for more or less than one (1) year:

1.   If insurance has been in force for twelve (12) months or less, apply the standard short rate table for annual insurances to the full annual premium determined as for an insurance written for a term of one (1) year.

2.   If insurance has been in force for more than twelve (12) months:

(a)   Determine full annual premium as for an insurance written for a term of one (1) year.

(b)   Deduct such premium from the full insurance premium, and on the remainder calculate the pro-rata earned premium on the basis of the ratio of the length of time beyond one (1) year the insurance has been in force to the length of time beyond one (1) year for which the insurance was originally written.

(c)   Add premium produced in accordance with items (a) and (b) to obtain earned premium during full period insurance has been in force.

Furthermore and notwithstanding the foregoing, the Underwriters shall retain the total premium for this Policy, such total premium to be deemed earned upon inception of the Policy if any **Claim**, **Loss** or any circumstance that could reasonably be the basis for a **Claim** or **Loss** is reported to the Underwriters under this Policy on or before such date of cancellation.

F00226
052011 ed.

Complaint, Exhibit A