UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Fair Isaac Corporation,                                  File No. 21-cv-734 (ECF/JFD)

       Plaintiff,

v.                                                       **OPINION AND ORDER**

Certain Underwriters at Lloyd's, London
Subscribing to Beazley AFB Media Tech
Policy Number W100FC171201, Syndicates
2623 and 623,

       Defendant.

---

Rikke A. Dierssen-Morice, Bryan R. Freeman, and Judah Druck, Maslon LLP, Minneapolis, MN, for Plaintiff Fair Isaac Corporation.

Kevin Kieffer, Ryan C. Tuley, and James A. Hazlehurst, Troutman Pepper Hamilton Sanders LLP, Irvine, CA; and Armeen Mistry Shroff, Troutman Pepper Hamilton Sanders LLP, Southfield, MI, for Defendant Certain Underwriters at Lloyd's, London Subscribing to Beazley AFB Media Tech Policy Number W100FC171201, Syndicates 2623 and 623.

---

Plaintiff Fair Isaac Corporation ("FICO") filed this coverage action to enforce its rights under a liability policy issued by Defendant Certain Underwriters at Lloyd's, London Subscribing to Beazley AFB Media Tech Policy Number W100FC171201, Syndicates 2623 and 623 ("Beazley"). FICO claims Beazley has breached its duty to defend FICO against claims of "product disparagement" in consolidated class-action lawsuits pending in the United States District Court for the Northern District of Illinois. FICO seeks monetary and declaratory relief, along with attorneys' fees it has incurred in enforcing its

rights in this lawsuit.  Beazley argues that the consolidated lawsuits are not covered under the policy and, alternatively, that three coverage exclusions apply.

Each side has moved for summary judgment to enforce the policy in its favor.  The parties agree that there are no material facts in dispute and that coverage turns on policy interpretation.  Beazley's summary-judgment motion will be granted, and FICO's motion will be denied.  Beazley has met its burden to show that FICO's claim falls within exclusions for claims arising from actual or alleged violations of antitrust and consumer-protection laws.

I

*The Parties.*  FICO is a Delaware corporation with its principal place of business in San Jose, California.  Compl. [ECF No. 1-1 at 7–21] ¶ 2.  FICO developed the "first-ever credit scoring model in 1958," which potential creditors now use for loan origination, account management, and prescreening.  *Id.* ¶ 1.  Beazley is a group of insurance companies with their principal places of business in London, England.  *Id.* ¶ 3.  Beazley contracted with FICO to provide liability insurance for a policy period of November 12, 2017, to November 12, 2018, under an AFB Media Tech® policy bearing policy number W100FC171201.  ECF No. 73-1 at 2–56 ("Policy").  The Policy carries an "Aggregate Limit of Liability" of $15 million and retention of $2 million for each "Claim."  Policy Declarations, Items 3–4, §§ VII–VIII.

*The Policy's Coverage Terms.*  This action concerns the Policy's "**Multimedia and Advertising Liability**" coverage provision, under which Beazley agreed to pay on FICO's behalf:

2

> **Damages** and **Claims Expenses**, in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of liability imposed by law or **Assumed Under Contract** resulting from any **Claim** first made against any **Insured** during the **Policy Period** . . . for one or more of the following acts . . . in the course of the **Insured Organization's** performance of **Professional Services**, **Media Activities**, or **Technology Based Services**:
>
> 1.    defamation, libel, slander, product disparagement, trade libel, prima facie tort, infliction of emotional distress, outrage, outrageous conduct, or other tort related to disparagement or harm to the reputation or character of any person or organization; . . . .

Policy § I.F.1.  Relevant here, a "**Claim**" is defined to include "a written demand received by any **Insured** for money or services, including the service of a suit" and the "threat or initiation of a suit seeking injunctive relief."  *Id.* § VI.F.  "Multiple **Claims** arising from the same or a series of related or repeated acts, errors or omissions, or from any continuing acts, errors or omissions, . . . shall be considered a single **Claim**."  *Id.*  Under the Policy's "Defense and Settlement of Claims" provision, Beazley agreed to defend FICO against "any **Claim** . . . seeking **Damages** . . . payable under the terms of this Policy, even if any of the allegations of the **Claim** are groundless, false or fraudulent" and against "any **Claim** in the form of a civil suit . . . that seeks injunctive relief . . . for one or more of the acts listed in Insuring Agreement F."  *Id.* § II.A.1.–2.

 *Implicated here are three of the Policy's coverage exclusions: Exclusion K ("Antitrust Exclusion"), Exclusion L ("Consumer Protection Law Exclusion"), and a Fair Isaac Prior and Pending Litigation Exclusion Endorsement.*  First, the Antitrust Exclusion excludes from coverage "any **Claim** or **Loss**: . . . [f]or, arising out of or resulting from any

actual or alleged antitrust violation, restraint of trade, unfair competition (except as provided in Insuring Agreement F.11), false or deceptive or misleading advertising or violation of the Sherman Antitrust Act, the Clayton Act, or the Robinson Patman Act, as amended[.]" *Id.* § V.K.  Second, the Consumer Protection Law Exclusion excludes from coverage, with exceptions that do not apply here, "any **Claim** or **Loss**: . . . [f]or, arising out of or resulting from any actual or alleged false, deceptive or unfair trade practices, or violation of consumer protection laws[.]" *Id.* § V.L.  And third, the Fair Isaac Prior and Pending Litigation Exclusion Endorsement amended the Policy's exclusions by removing coverage for "any **Claim** or **Loss**:

> Based upon, arising out of or resulting directly or indirectly from or in consequence of, or in any way involving:
>
> 1.  any prior or pending litigation as of 12:01 a.m. Local Time on 12 November 2006, including but not limited to the *Fair Isaac v. Equifax, et al.* litigation (U.S.D.C. Minn.), and including any cross claims, counter-claims or any other claims or litigation arising out of, relating to or made in response to the *Fair Isaac v. Equifax, et al.* claim, whether made before or after the inception date;
>
> 2.  any fact, circumstance, situation, transaction or event underlying or alleged in such claim or litigation, regardless of the legal theory upon which such claim is predicated[.]"

ECF No. 73-1 at 21.  The Prior and Pending Litigation Exclusion Endorsement refers to the first of three lawsuits that set the stage for this dispute.  An initial overview of those lawsuits helps frame the parties' coverage arguments.

4

*The Equifax Litigation.*  In 2006, FICO lodged claims of false advertising, antitrust, and unfair competition against Equifax, TransUnion, and Experian ("Credit Bureaus"), and claimed that VantageScore—a competing credit-scoring system and joint venture of the Credit Bureaus—infringed on FICO's trademarks.  *See* Third Am. Compl. [ECF No. 436], *Fair Isaac Corp., et al. v. Equifax, Inc.*, No. 06-cv-4112 (ADM/JSM) (D. Minn. Nov. 10, 2008) ("Equifax Litigation").  The Credit Bureaus counterclaimed, later prevailing at trial and on appeal to the Eighth Circuit on claims that FICO procured a trademark by making fraudulent misrepresentations to the U.S. Patent and Trademark Office.  *See id.*, ECF Nos. 968, 1115.

*The TransUnion Action.*  The second stage-setting lawsuit began in November 2017, when FICO sued TransUnion in the U.S. District Court for the Northern District of Illinois. FICO alleged that TransUnion committed breach of contract, copyright infringement, conversion, and unjust enrichment through unauthorized use of FICO's proprietary algorithms and credit-scoring software.  *See* Compl. [ECF No. 1], *Fair Isaac Corp. v. Trans Union LLC*, No. 17-cv-8318 (N.D. Ill. Nov. 16, 2017) ("TransUnion Action").  TransUnion counterclaimed, asserting various causes of action, including antitrust claims, breach of contract, and claims for violating state statutes.  The gist of TransUnion's counterclaims was that FICO, for over a decade, behaved anti-competitively to "discourage the adoption of VantageScore and preserve its own monopoly" in the credit-scoring market.  *See* ECF No. 68-1 at 2–44, ¶ 5.  TransUnion alleged that FICO's "campaign" against VantageScore started with the Equifax Litigation, where its claims were "meritless," designed to "dissolve" VantageScore, and "seen by a substantial number of businesses and consumers

5

in California and Illinois." *Id.* ¶¶ 72–74.  The TransUnion Action claims were settled, and the case was voluntarily dismissed in September 2020.  *See TransUnion Litig,* ECF Nos. 258, 259.

> *The Underlying Lawsuits and Consolidated Actions.*  Last are the series of lawsuits spawning this litigation—the lawsuits for which FICO now seeks coverage.  Between April and August 2020, ten putative class actions were filed against FICO in the U.S. District Court for the Northern District of Illinois ("Underlying Lawsuits").[1]  The plaintiffs are purchasers of FICO credit scores—lenders, financial institutions, and other entities—who allege that FICO charged monopolistic prices by engaging in various anticompetitive conduct.  Each suit advanced some combination of claims for violations of the Sherman Act, state antitrust laws, state consumer protection laws, and unjust enrichment.  District Judge Edmond E. Chang consolidated the Underlying Lawsuits, appointed interim counsel for two groups of plaintiffs—"direct purchasers" and "indirect purchasers"—and ordered each group of plaintiffs to file a consolidated class-action complaint.  *See* ECF Nos. 83, 106, *In Re FICO Antitrust Litig.*, No. 1:20-cv-2114 (N.D. Ill.) ("Consolidated Actions").  Each has now done so and asserts substantially similar claims for violations of the Sherman Act, state antitrust laws, and state unfair and deceptive trade practices laws against FICO, but also against the Credit Bureaus.  *See id.*, ECF Nos. 121 ("DP Compl."), 122 ("IP Compl.").  The indirect-purchaser plaintiffs also assert unjust enrichment claims.  IP

---

[1]     FICO has filed the original complaints in those actions as Exhibits 7 through 16 to the Declaration of Rikke Dierssen-Morice.  *See* ECF No. 68-2; ECF No. 68-3; ECF No. 68-4 at 1–173.

Compl. ¶¶ 363–67.  The consolidated complaints repeat allegations of FICO's "decades-long campaign of anticompetitive conduct" to undermine VantageScore and preserve FICO's monopoly, but also allege that FICO conspired with the Credit Bureaus "to monopolize the B2B Credit Score Market, despite their own interest in VantageScore's success."  DP Compl. ¶ 8; IP Compl. ¶ 12.  FICO charged monopoly prices, the plaintiffs allege, by entering anticompetitive contracts with the Credit Bureaus that forbid them from marketing non-FICO credit scores, that charged exorbitant prices for FICO credit-scoring services, and that eliminated price competition between the Credit Bureaus.  *See, e.g.*, DP Compl. ¶¶ 108–130; IP Compl. ¶¶ 123–153.  Beyond this conspiracy, the plaintiffs also allege that FICO "waged an aggressive public relations and advertising campaign" to steer consumers away from VantageScore.  DP Compl. ¶ 131; IP Compl. ¶ 154.  "In advertisements, letters, and blog posts, [FICO] disparaged VantageScore . . . , falsely claiming that VantageScore is an unreliable measure of creditworthiness, and misrepresenting the information considered by VantageScore Solutions' credit scoring system."  DP Compl. ¶ 131; *see* IP Compl. ¶¶ 154–161.  The Consolidated Actions remain pending.  FICO and the Credit Bureaus have each moved to dismiss the case for failure to state a claim, and those motions remain under advisement.  *See id.*, ECF Nos. 135, 138.

*After denying coverage at first, Beazley agreed to defend FICO in the TransUnion Action.*  FICO timely noticed claims on the Policy for coverage against the TransUnion Action counterclaims, and Beazley initially denied coverage.  Beazley acknowledged that allegations of product disparagement could "be read to fall within the scope of the Policy's Multimedia and Advertising Liability coverage," yet concluded that FICO's claim was

7

excluded, including by the Antitrust and Consumer Protection Law Exclusions, because the product disparagement allegations were tethered to "antitrust and unfair competitions claims[] and involve[d] alleged false advertising by FICO."  ECF No. 68-1 at 50.  FICO disagreed.  The product disparagement allegations fell outside the Antitrust Exclusion's denial of coverage for "false and deceptive or misleading advertising," FICO reasoned, because TransUnion alleged product disparagement through other channels (not just in advertising).  *Id.* at 56–57.  And, FICO contended, the Antitrust Exclusion's exclusion of coverage for advertising conflicted with the Policy's coverage for disparaging statements in advertising, creating ambiguity that was to be construed in favor of coverage.  *Id.* at 57.  As to the Consumer Protection Law Exclusion, FICO likewise asserted a conflict with the Policy's Multimedia and Advertising Liability coverage, and also argued it was inapplicable to the TransUnion Action, where the "laws are invoked by a sophisticated commercial party to recover damages for alleged wrongs committed by another sophisticated commercial party."  *Id.*  In August 2019, Beazley changed its position, and agreed to defend FICO "based solely on TransUnion's allegations that FICO disparaged TransUnion's products."  *Id.* at 60.

   *Despite similarities to the TransUnion Action, Beazley has denied coverage for the Underlying Lawsuits and Consolidated Actions.*  In April 2020, FICO timely tendered the Underlying Lawsuits to Beazley for coverage under the Policy.[2]  Beazley concluded that the Underlying Lawsuits and TransUnion Action formed "a single Claim" under the Policy

---

[2]      Although FICO's initial letter referenced just nine Underlying Lawsuits, it tendered the tenth in later correspondence.  *See* ECF No. 68-4 at 189.

because the suits arose "from the same or a series of related, repeated, or continuing acts, errors, or omissions by FICO."  ECF No. 68-4 at 180.  In each case, Beazley observed, claimants alleged "FICO had engaged in anticompetitive conduct in connection with TransUnion's VantageScore product, including an advertising and media campaign disparaging VantageScore." *Id.* at 180–81.  Still, Beazley disclaimed coverage, reasoning that the allegations were not within the scope of any Policy coverage provision.  Beazley recognized that the plaintiffs, like in the TransUnion Action, "allege[d] FICO ha[d] disparaged VantageScore," but it found a distinguishing feature: plaintiffs in the Underlying Lawsuits did "<u>not</u> allege any basis . . . on which <u>the plaintiffs</u> could recover for [the] alleged disparagement, which [] was directed not at <u>them</u> or <u>their</u> products, but rather at a competing credit score product offered by other businesses." *Id.* at 183.  Thus, Beazley determined, the Underlying Lawsuits sought recovery strictly for "antitrust injury" and did not trigger its duty to defend against Claims of "product disparagement." *Id.*  Beazley also concluded that coverage was independently precluded by the Antitrust Exclusion, the Consumer Protection Law Exclusion, and the Prior and Pending Litigation Exclusion Endorsement. *Id.* at 184–85.  By letter dated August 2020, FICO sought reconsideration of Beazley's coverage stance.  That the alleged disparagement was directed towards a third-party's product in the Underlying Lawsuits, and not the plaintiffs' product, was not grounds for denial, FICO wrote, and the Policy's exclusions were inapplicable. *Id.* at 190–93. Beazley's position did not change. *See* ECF No. 73-4 at 53–57.

*FICO brought this suit in March 2021.*  FICO filed suit originally in Minnesota state district court, and Beazley timely removed based on diversity jurisdiction under 28 U.S.C.

§ 1332.  Not. of Removal ¶¶ 2–8 [ECF No. 1].  In Count One of its three-count Complaint, FICO alleges that Beazley has breached its duty to defend under the Policy by declining to defend against the Underlying Lawsuits.  Compl. ¶¶ 58–62.  In Counts Two and Three, FICO seeks a judgment declaring Beazley's duties to defend and indemnify FICO in the Underlying Lawsuits (now, the Consolidated Actions).  *Id.* ¶¶ 63–72.

*Each party has moved for summary judgment.*  ECF Nos. 65, 70.  FICO maintains that Beazley's duty to defend has been triggered by allegations of "product disparagement" in the Underlying Lawsuits and Consolidated Action, and it seeks "partial" summary judgment declaring that (1) Beazley owes it a defense in the Consolidated Actions and (2) because Beazley has breached its duty to defend, FICO has a right to recover attorneys' fees incurred in this lawsuit.  Pl.'s Mem. in Supp. [ECF No. 66] at 37–38.  Beazley seeks a summary-judgment ruling that FICO is not entitled to coverage, either because allegations in the Consolidated Actions do not trigger coverage or because one of three exclusions applies.  *See* Def.'s Mem. in Supp. [ECF No. 72] at 31–32.

II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."

*Id.* at 255 (citation omitted).   Courts take a "slightly modified" approach when, as here, multiple parties have moved for summary judgment.   *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012).   In resolving FICO's motion, the record is viewed in the light most favorable to Beazley, and in resolving Beazley's motion, the record is viewed in the light most favorable to FICO.   *See id.*

A

Under New York law,[3] "[a]n insurance agreement is subject to principles of contract interpretation."   *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 37 N.E.3d 78, 80 (N.Y. 2015).   "Therefore, as with the construction of contracts generally, unambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court."   *Burlington Ins. Co. v. NYC Transit Auth.*, 79 N.E.3d 477, 481 (N.Y. 2017) (cleaned up).   "If the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer."[4]   *Westview Assocs. v. Guaranty Nat'l Ins. Co.*, 740 N.E.2d 220, 223 (N.Y. 2000).   "'Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent,' or where

---

[3]     The parties agree that the Policy's choice-of-law clause is controlling, and that New York's substantive law therefore governs interpretation of the Policy.   Pl.'s Mem. in Supp. at 2; Def.'s Mem. in Supp. at 14; *see* Policy Declarations, Item 11, § XXV.

[4]     Neither party has marshalled extrinsic evidence to help ascertain the Policy's meaning, making interpretation an issue of law.   *See City of New York v. Evanston Ins. Co.*, 830 N.Y.S.2d 299, 302 (N.Y. App. Div. 2007) (citing *State of New York v. Home Indem. Co.*, 486 N.E.2d 827, 829 (N.Y. 1985)).

its terms are subject to more than one reasonable interpretation." *Universal Am. Corp.*, 37 N.E.3d at 680 (citations omitted).

This dispute spans both coverage and exclusionary terms. "Generally, it is for the insured to establish coverage and for the insurer to prove that an exclusion in the policy applies to defeat coverage." *Consol. Edison Co. ofNew York, Inc. v. Allstate Ins. Co.*, 774 N.E.2d 687, 690 (N.Y. 2002). "An insurer's duty to defend is liberally construed and is broader than the duty to indemnify." *Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co.*, 945 N.E.2d 1013, 1017 (N.Y. 2011); *see also Frontier Insulation Contractors, Inc. v. Merchs. Mut. Ins. Co.*, 690 N.E.2d 866, 870 (N.Y. 1997) ("[A]n insurer may be contractually bound to defend even though it may not ultimately be bound to pay, either because its insured is not factually or legally liable or because the occurrence is later proven to be outside the policy's coverage." (citation omitted)). The duty to defend is "exceedingly broad and an insurer will be called upon to provide a defense whenever the allegations of the complaint suggest a reasonable possibility of coverage." *BP Air Conditioning Corp. v. One Beacon Ins. Grp.*, 871 N.E.2d 1128, 1131 (N.Y. 2007) (cleaned up). "If [a] complaint contains any facts or allegations which bring the claim even potentially within the protection purchased, the insurer is obligated to defend." *Id.* (quotation omitted). "If, liberally construed, the claim is within the embrace of the policy," the insurer's duty to defend is triggered, "no matter how groundless, false or baseless the suit may be." *Auto. Ins. Co. of Hartford v. Cook*, 850 N.E.2d 1152, 1155 (N.Y. 2006) (quotation omitted). If "any of the claims against an insured arguably arise from covered events, the insurer is required to defend the entire action." *Fieldston*, 945 N.E.2d at 1018

12

(quoting *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 779 N.E.2d 167, 170 (N.Y. 2002)). Even when the "four corners of the complaint" do not show a reasonable possibility of coverage, the insurer must still defend when armed with "actual knowledge" of facts beyond the complaint that do. *Westport Ins. Corp. v. Napoli, Kaiser & Bern*, 746 F. Supp. 2d 502, 507 (S.D.N.Y. 2010) (citing *Fitzpatrick v. Am. Honda Motor Co.*, 575 N.E.2d 90, 92–95 (N.Y. 1991)).

B

Start with a threshold issue: whether, given their relatedness, the Consolidated Actions and TransUnion Action form a "single Claim" under the Policy and, if so, what that means for analyzing Beazley's duty to defend the Consolidated Actions. To recap, the Policy states in relevant part that "[m]ultiple **Claims** arising from the same or a series of related or repeated acts, errors or omissions, or from any continuing acts, errors or omissions, . . . shall be considered a single **Claim** for the purposes of this Policy, irrespective of the number of claimants or **Insureds** involved in the **Claim**. All such **Claims** shall be deemed to have been made at the time of the first such **Claim**." Policy § VI.F. FICO's position is that the lawsuits form a single Claim. For this reason, it says, Beazley's decision to defend the TransUnion Action "necessarily means that Beazley has a duty to defend the Underlying Lawsuits as well." Pl.'s Mem. in Opp'n at 39 [ECF No. 81]. Beazley seems to agree that the two lawsuits are related and form a "single Claim," but it disagrees on the import of that result. In Beazley's view, the Policy's "related claims" language has a more limited purpose: "determin[ing] which policy responds to a claim, the applicable limits, and the applicable Self-Insured Retention." Def.'s Mem. in Opp'n at 5

13

[ECF No. 83].  Despite its treatment as a single "Claim" with the TransUnion Action, Beazley says its duty to defend in the Consolidated Actions must be evaluated separately under the Policy's terms.  *Id.*

Beazley's argument is the better one.  In claims-made policies, "related claims" provisions serve a limited purpose and typically can have one or both of two effects.  First, if multiple claims meet some level of relatedness, they may be treated as one claim with a consolidated retention and coverage limit.  If the claims are not related, on the other hand, they are treated separately, triggering multiple limits and retentions.  Second, a related-claims term may cause all later, related claims to be treated as though made at the time of the oldest claim.  This relation back of a claim may dictate whether it falls within the claims-made policy's policy period.  *See generally* John Zulkey, *Related Acts Provisions: Patterns Amidst the Chaos*, 50 VAL. U. L. Rev. 633, 637–39 (2016).  Courts have rejected arguments to interpret related-claims terms expansively to "fold[] in a claim that is otherwise outside policy coverage."  *Marcus v. Allied World Ins. Co.*, 384 F. Supp. 3d 115, 125 (D. Me. 2019).  *Marcus* is illustrative.  There, an insurer agreed that two related lawsuits formed a "single claim" under a policy's related-claims provision.  The court found the insurer's duty to defend was triggered by the first lawsuit, but that it did not extend to the second.   Nothing in the policy, it reasoned, "suggest[ed] that the provision affect[ed] anything other than determining the timeliness of notice, the insurance policy that applie[d], and the policy limits and deductibles."  384 F. Supp. 3d at 125; *see also Duckson v. Cont'l Cas. Co.*, No. 14-cv-1465 (MJD/JJK), 2015 WL 75262, at *8 (D. Minn. Jan. 6, 2015) ("The purpose of the provision is to accumulate and determine the number

14

and amount of deductibles and per claim policy limits that apply to a legal malpractice claim or lawsuit.  The related claims provision does not provide coverage for activities that would otherwise not be covered by the policy . . . .") (internal citation omitted).  FICO cites no authority construing a similar related-claims term to mandate coverage for all later claims deemed "related" to an earlier, covered claim, and this case is no different.  The Policy specifies that related Claims are considered a single Claim "irrespective of the number of claimants or Insureds involved" and will be "deemed to have been made at the time of the first such Claim."  Policy § VI.F.  Under a reasonable construction of the Policy, Beazley's decision to defend the TransUnion Action, paired with its treatment of the Consolidated Actions as a "single Claim" under Section VI.F, cannot alone create a duty to defend the Consolidated Actions.  FICO's claim to a defense in the Consolidated Actions must be considered independent of its earlier claim for coverage in the TransUnion Action.  Beazley's duty to defend turns on whether the allegations in the Underlying Lawsuits and Consolidated Actions "suggest a reasonable possibility of coverage"—and not on allegations in the TransUnion Action.

## C

Next is whether FICO has made a prima facie showing of coverage.  FICO asserts that Beazley's duty to defend was triggered by allegations of "product disparagement" in the Underlying Lawsuits.  Pl.'s Mem. in Supp. at 22.  Under New York law, product disparagement means a malicious statement falsely "denigrating the quality of [a] business'[s] goods or services."  *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 422 N.E.2d 518, 522 (N.Y. 1981); *see also Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*,

194 F. Supp. 3d 263, 291 (S.D.N.Y. 2016) ("[P]roduct disparagement is an action to recover for words or conduct which tend to disparage or negatively reflect upon the condition, value or quality of a product or property.") (citation omitted).  There are factual allegations that FICO disparaged a product, VantageScore, in the Consolidated Actions (and also, if it matters, in the complaints filed originally in the Underlying Lawsuits).[5]  *See* DP Compl. ¶¶ 131–140; IP Compl. ¶¶ 154–161; *see, e.g.*, ECF No. 68-2 ¶¶ 74–82.  The underlying plaintiffs do not, however, assert causes of action for the tort of product disparagement.  Under New York law, that doesn't seem necessary.  The duty to defend kicks in whenever a complaint "contains any *facts or allegations* which bring the claim *even potentially* within the protection purchased."  *BP Air Conditioning Corp.*, 871 N.E.2d at 1131 (emphasis added) (citation omitted); *see, e.g.*, *PCB Piezotronics, Inc. v. Kistler Instrument Corp.*, No. 96-CV-0512E(F), 1997 WL 800874, at *3 (W.D.N.Y. Dec. 31, 1997) (rejecting argument that word "disparage," used in coverage term, was "exclusive reference to the common law tort of product disparagement"); *Dollar Phone Corp v. St. Paul Fire & Marine Ins. Co.*, No. CV-09-1640 (DLI)(VVP), 2012 WL 1077448 (E.D.N.Y. Mar. 9, 2012) (same), *report and recommendation adopted*, 2012 WL 1078994 (E.D.N.Y. Mar. 30, 2012).  And critically, the relevant coverage language is at least ambiguous in this respect, meaning that, read in FICO's favor, the Policy's coverage for enumerated "acts,"

---

[5]     The Policy excludes coverage for Claims "arising out of or resulting from any actual or alleged . . . false or deceptive misleading advertising."  Policy § V.K.  Though acknowledging the argument, Beazley has not rebutted FICO's contention that the underlying product-disparagement allegations go beyond advertising.  Def.'s Mem. in Opp'n at 14; Def.'s Reply [ECF No. 85] at 4–5.

including "product disparagement," does not bar defense coverage merely because the underlying plaintiffs do not assert a cause of action for product disparagement.

Beazley mounts a slightly different challenge to FICO's prima facie showing. Its duty to defend against Claims under the Policy's Multimedia and Advertising Liability coverage is not triggered, it says, because plaintiffs in the Consolidated Actions are "FICO's customers – not its competitors," and they "do not allege that FICO disparaged their [own] products." Def.'s Mem. in Supp. at 17–18. This matters, Beazley says, because the allegations don't offer even the "*potential* . . . for a cause of action for product disparagement." Def.'s Mem. in Opp'n at 10 (emphasis added); *see also* Def.'s Reply at 3 ("Beazley is applying (not rewriting) the Policy language because the Policy requires that liability be *imposed by law* . . . for a Claim for product disparagement."). FICO counters that the Policy does not limit coverage to allegations of product disparagement directed towards a plaintiffs' own products and that reading such a limitation would violate the canon that coverage ambiguities be resolved in its favor. Pl.'s Mem. in Supp. at 23–24; Pl.'s Mem. in Opp'n at 9–11.

For Beazley's part, the weight of persuasive authorities has found no duty to defend under like circumstances. In *Great American Ins. Co. v. Riso*, for example, an underlying lawsuit was similarly one by consumers advancing antitrust claims in part with allegations that the insured had disparaged its competitors: the insured was alleged to have unlawfully restrained trade through "refusing to sell replacement parts to independent service providers, territorial restraints on its own dealers, tying machine sales to use of [its] parts, and disparaging competitors in the supplies market as 'supply pirates' whose products

17

could 'cause serious damage'—not covered by [the insured]'s warranty—to the machine." 479 F.3d 158, 159 (1st Cir. 2007).  The insured sought a defense under its primary and umbrella policies, relying on coverage for injuries "arising out of" the publication of materials that "slander[ed] or libel[ed] a person or organization or disparage[d] a person's or organization's goods, products or services." *Id.* at 160.  At "first blush," the First Circuit noted, the underlying complaint was a "garden-variety antitrust suit" that fell outside the policy's coverage for commercial disparagement and similar "offenses." *Id.* at 161. Although the Massachusetts Supreme Judicial Court had, in one case, found a duty to defend a breach of contract suit based on coverage for claims arising from "the publication or utterance . . . of other defamatory [or] disparaging material," the First Circuit distinguished *Riso* because the underlying allegations of disparagement were not directed at the plaintiffs.  *Riso* instructs there is no duty to defend against, as here, an "antitrust complaint . . . brought by plaintiffs who never themselves suffered any reputational injury and whose allegations of disparagement instead concerned anticompetitive conduct directed against others not party to the suit." *Id.* at 162–63.

In a case perhaps even more closely resembling this one, the Seventh Circuit agreed with *Riso*. *See BASF AG v. Great Am. Assurance Co.*, 522 F.3d 813 (7th Cir. 2008).  In *BASF*, an insured sought a defense against class actions alleging it had monopolized the market for thyroid medication, in part by discrediting a study which found the drug no more effective than cheaper, generic alternatives. *Id.* at 817.  The plaintiffs alleged that the monopolization had caused consumers and health insurers to pay higher prices for the insured's drug, rather than purchase those alternatives. *Id.*  The court observed that Illinois

18

law did not require the plaintiffs to "specifically plead a covered cause of action to trigger an insurer's duty to defend." *Id.* at 819–20.  Thus, the court considered whether the underlying factual allegations "could tacitly sketch a claim [] within the scope of the policy." *Id.* at 820 (quotation omitted).  The court answered in the negative, reasoning that disparagement requires "a false statement be made about the plaintiff." *Id.*  The court declined to read coverage expansively to cover all claims with "their origin in" disparagement because doing so "would unmoor coverage determinations from the factual allegations of the complaint." *Id.* at 822.  As here, the underlying plaintiffs sought "only economic damages for the injuries they suffered from [] artificially high prices" that stemmed from alleged monopolization—a "paradigmatic antitrust injury." *Id.*  Allowing policyholders to "shoehorn" collateral claims into coverage for slander, libel, or disparagement, it concluded, "could easily transform a run-of-the-mill antitrust or securities action into a suit seeking dress of libel, slander, or disparagement." *Id.*  Other courts have reached similar outcomes on similar facts.  *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Mead Johnson & Co.*, 913 F. Supp. 2d 682, 685–88 (S.D. Ind. 2012) (finding no defense coverage was triggered by analogous consumer lawsuits alleging third-party disparagement); *Microsoft Corp. v. Zurich Am. Ins. Co.*, No. C00-521P, 2001 WL 765871, at *5–6 (W.D. Wash. July 2, 2001) (underlying antitrust suit did not trigger coverage for injuries arising from disparagement when disparagement allegations concerned insured's competitors, and not plaintiffs); *QSP, Inc. v. Aetna Cas. & Sur. Co.*, 773 A.2d 906, 917–18 (Conn. 2001) (no coverage for injury arising out of "[o]ral or written publication of material that . . . disparages a person's or organization's goods, products, or services"

19

because underlying allegations of disparaging conduct was directed toward insured's competitors and not plaintiffs).

But FICO has a point. The Multimedia and Advertising Liability coverage does not limit coverage for product disparagement to claims *by* those whose own product has been disparaged; it covers those facing monetary liability "resulting from any **Claim** . . . for one or more of [enumerated] acts," including product disparagement. Policy § I(F). Insurers can and do specify that product-disparagement or similar coverage is limited to claims "brought by a person or organization that claims to have been slandered or libeled, or that claims to have had its goods, products or services disparaged." *Travelers Indem. Co. of Am. v. Luna Gourmet Coffee & Tea Co. LLC*, 533 F. Supp. 3d 1013, 1024 (D. Colo. 2021). Thus, as FICO points out, reading such a limitation into the Policy's Multimedia and Advertising Liability coverage would seem to violate the well-settled rule that coverage ambiguities are resolved against the insurer.

## D

Regardless, Beazley has met its burden to show that FICO's claim is excluded. "To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Westview Assocs.*, 740 N.E.2d at 223. Thus, when seeking to avoid its duty to defend, "the burden rests upon the insurance company to demonstrate that the allegations of the complaint can be interpreted only to exclude coverage." *Town of Massena*, 779 N.E.2d at 170; *see also Technicon Elecs. Corp. v. Am. Home Assurance Co.*, 542 N.E.2d 1048, 1050 (N.Y. 1989) ("[T]he insurer has the burden

of demonstrating that the 'allegations of the [underlying] complaint cast that pleading solely and entirely within the policy exclusions, and, further, that the allegations, *in toto*, are subject to no other interpretation.") (citation omitted)).

Beazley has shown at least that the Policy's Antitrust and Consumer Protection Law Exclusions apply here.  It is true that, to avoid the duty to defend based on an exclusion, the underlying complaint's allegations must place the insured's claim *wholly* within the exclusion.  It's no wonder, then, that the allegations of underlying suits often straddle exclusion provisions when different types of legal claims are asserted.  But the Antitrust Exclusion and Consumer Protection Law Exclusions are sweeping, together excluding from coverage "any **Claim** or **Loss**: . . . [f]or, arising out of or resulting from any actual or alleged antitrust violation, restraint of trade, unfair competition (except as provided in Insuring Agreement F.11), false or deceptive or misleading advertising or violation of the Sherman Antitrust Act, the Clayton Act, or the Robinson-Patman Act, as amended" or "from any actual or alleged false, deceptive or unfair trade practices, or violation of consumer protection laws."  Policy §§ V.K.–L.  Under New York law, phrases like "arising out of" remain "unambiguous" when found in policy exclusions and mean "originating from, incident to, or having connection with."  *Country-Wide Ins. Co. v. Excelsior Ins. Co.*, 46 N.Y.S.3d 96, 98 (N.Y. App. Div. 2017); *see Scottsdale Indem. Co. v. Beckerman*, 992 N.Y.S.2d 117, 121 (N.Y. App. Div. 2014) (collecting cases).  "[I]f the plaintiff in an underlying action or proceeding alleges the existence of facts clearly falling within such an exclusion, and none of the causes of action that he or she asserts could exist but for the existence of the excluded activity or state of affairs, the insurer is under no obligation to

defend the action." *Beazley Ins. Co. v. ACE Am. Ins. Co.*, 880 F.3d 64, 71 (2d Cir. 2018) (citation omitted) (concluding that federal securities and state-law negligence claims fell within professional services exclusion). Here, then, the salient question is whether the underlying plaintiffs can prove and prevail under a theory of product disparagement without proving acts covered by the Antitrust Exclusion and Consumer Protection Law Exclusion. *See Nat. Organics, Inc. v. OneBeacon Am. Ins. Co.*, 959 N.Y.S.2d 204, 208 (N.Y. App. Div. 2013) (finding plaintiffs asserted product disparagement claim under Lanham Act independent of excluded breach of contract conduct); *Mount Vernon Fire Ins. Co. v. Creative House.*, 668 N.E.2d 404, 435 (N.Y. 1996) ("Merely because the insured might be found liable under some theory of negligence does not overcome the policy's exclusion for injury resulting from assault.").

Consider the underlying plaintiffs' claims. As discussed, they do not advance causes of action for product disparagement or another claim that would require proving its equivalent. The plaintiffs assert various causes of action that plainly could not exist but for the existence of excluded conduct: violations of the Sherman Act, 15 U.S.C. §§ 1–3, violations of state antitrust laws, and violations of state consumer protection laws and unfair and deceptive trade practices laws. IP Compl. ¶¶ 194–362; DP Compl. ¶¶ 168–321. The product-disparagement allegations merely serve to support these claims. It's true that the indirect-purchaser plaintiffs also advance a cause of action for unjust enrichment, IP Compl. ¶¶ 363–367, but that claim fares no better. The indirect purchasers' theory of recovery is that FICO and the Credit Bureaus "have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices of and unlawful profits from FICO

22

scores." *Id.* ¶ 365.  The plaintiffs' unjust enrichment claims are an equitable remedy and, insofar as they concern product disparagement, could not have occurred without the events forming their antitrust and consumer protection claims: FICO's collection of profits derived from charging them monopoly prices.  And critically, because the plaintiffs' allegations are that a third-party product was disparaged, and not their own, the allegations do not raise even a possibility of recovery premised on non-excluded product disparagement.  Thus, although allegations in a complaint must fall wholly, and not partly, within an exclusion, here, they do: the underlying product disparagement allegations "arise out of or result from actual or alleged" violations of antitrust and consumer protection law. *See Carfax, Inc. v. Ill. Nat'l Ins. Co.*, 71 N.Y.S.3d 478, 479–80 (N.Y. App. Div. 2018) (applying Michigan law and concluding that reference to product disparagement "in the context of [] anti-trust claims" did not trigger defense duty in part due to antitrust exclusion); *Reagan Nat'l Advert. v. Hartford Cas. Ins. Co.*, 190 F. App'x 608, 611–12 (10th Cir. 2006) (allegations underlying malicious prosecution claim arose out of antitrust claim "because the underlying facts, if proven, were that [insured] filed sham litigation and abused the legal and regulatory processes to maintain a monopoly"); *Upsher-Smith Labs., Inc. v. Fed. Ins.*, 264 F. Supp. 2d 843, 850–51 (D. Minn. 2002) (various claims fell within exclusion that "unambiguously captures any cause[] of action that arises from, flows from, or has its origins in any actual or alleged antitrust violation").

Finally, this construction of the Policy does not, as FICO argues, "make a nullity" of, or render illusory, the Policy's coverage or exclusionary terms.  Pl.'s Reply [ECF No. 84] at 4–5; Pl.'s Mem. in Opp'n at 21–24.  An illusory contract is "[a]n agreement in which

one party gives as consideration a promise that is so insubstantial as to impose no obligation." *Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 71 N.E.3d 556, 562 (N.Y. 2017) (quoting Black's Law Dictionary 370 (9th ed. 2009)). "[A]n insurance policy is not illusory if it provides coverage for some acts [subject to] a potentially wide exclusion." *Id.* at 685 (citation omitted). Under New York law, rather, "[i]nsurance coverage is illusory where the insured purchases no effective protection." *Aspen Specialty Ins. Co. v. 4 NYP Ventures LLC*, 162 F. Supp. 3d 337, 345 (S.D.N.Y. 2016); *cf. Lend Lease*, 71 N.E.3d at 556 (exclusion not illusory where it "d[id] not defeat *all* of the coverage afforded" under coverage term). However rare the case, product disparagement may occur irrespective of allegations that arise from "actual or alleged" conduct excluded by the Policy's Antitrust and Consumer Protection Law exclusions. Take a case like the TransUnion Action. There, TransUnion, a FICO competitor, made factual allegations of product disparagement that could independently support such a claim (and perhaps other, non-excluded claims). Because TransUnion sued for disparagement of its own product, any claim for product disparagement could be made without reliance on excluded events, such as actual or alleged violations of antitrust or consumer protection laws.

In short, Beazley has shown that the Policy unambiguously excludes coverage for FICO's claim to a defense in the Consolidated Actions. In view of this result, it is unnecessary to consider the applicability of the Policy's Prior and Pending Litigation Exclusion Endorsement.

III

Beazley argues that with no duty to defend, it "necessarily has no duty to indemnify," making summary judgment appropriate with respect to this entire action. Def.'s Reply at 8. FICO argues that summary judgment as to Beazley's duty to indemnify is not ripe. Pl.'s Mem. in Opp'n at 40–41. In its view, a summary-judgment ruling on Beazley's duty to indemnify should wait until a determination of liability is made in the Consolidated Actions. *Id.* The problem for FICO, however, as evidenced by the cases it relies on, is that reason to defer deciding an insured's duty to indemnify only exists when its duty to defend has been triggered. In a case such as this, "when 'there is no duty to defend, there also is no corresponding duty to indemnify.'" *Spandex House, Inc. v. Hartford Fire Ins. Co.*, 407 F. Supp. 3d 242, 257 (S.D.N.Y. 2019) (quoting *Ogden Corp. v. Travelers Indem. Co.*, 924 F.2d 39, 42 (2d Cir. 1991)). Accordingly, summary judgment will be inclusive of FICO's claims for indemnification. That judgment will not prejudice FICO's ability to enforce its rights should circumstances in the Consolidated Actions materially change such that a reasonable possibility of coverage arises. *See id.*

## ORDER

Therefore, based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      Plaintiff's Motion for Partial Summary Judgment on Defendant's Breach of its Duty to Defend [ECF No. 65] is **DENIED**.

2.      Defendant's Motion for Summary Judgment [ECF No. 70] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  December 14, 2022                              s/ Eric C. Tostrud
                                                                           Eric C. Tostrud
                                                                           United States District Court